[CONSTRUCTION OF STATUTE.   EVIDENCE.]

## The UNITED STATES *against* AMEDY.

Under the act of the 26th of May, 1790, c. 38. [xī.] copies of the legislative acts of the several States, authenticated by having the seal of the State affixed thereto, are conclusive evidence of such acts in the Courts of other States, and of the Union. No other formality is required than the annexation of the seal; and, in the absence of all contrary proof, it must be presumed to have been done by an officer having the custody thereof, and competent authority to do the act.

Under the Crimes Act of the 26th of March, 1804, c. 393. [xl.] s. 2. on an indictment for destroying a vessel with intent to prejudice the underwriters, it is sufficient to show the existence of an association actually carrying on the business of insurance, by whose known officers *de facto* the policy was executed, and to prejudice whom the vessel insured was destroyed; without proving the existence of a legal corporation authorized to insure, or a compliance on the part of such corporation with the terms of its charter, or the validity of the policy of insurance.

The terms " *any person or persons,*" in the act, extend to *corporations,* and bodies politic, as well as to natural persons.

THE prisoner, John B. Amedy, was indicted in the Circuit Court of Virginia, under the act

of Congress of the 26th of March, 1804, c. 393.
[xl.ᵃ] for destroying a vessel with intent to preju-
dice the underwriters, and after a verdict of
guilty, his counsel moved the Court for a new
trial upon the following grounds:

1. That the exemplification of the acts of the
legislature of the State of Massachusetts, incor-
porating the Boston Insurance Company, (who
were the underwriters,) given at the trial, was
not admissible in evidence as a sufficient verifi-
cation thereof. The papers given in evidence
were printed copies of the acts, with certain
erasures and interlineations in writing, and to the
copy of each act was annexed a separate attes-
tation in the following words: "A true copy,

---

*a* Which provides, (s. 2.) " That if any person shall, on the
high seas, wilfully and corruptly cast away, burn, or otherwise de-
stroy, any ship or vessel of which he is owner in part or in whole,
or in anywise direct or procure the same to be done, with intent
or design to prejudice any person or persons that hath underwrit-
ten, or shall underwrite, any policy or policies of insurance there-
on, or of any merchant or merchants that shall load goods thereon,
or of any other owner or owners of such ship or vessel, the per-
son or persons offending therein, being thereof lawfully convicted,
shall be deemed and adjudged guilty of felony, and shall suffer
death."

It is stated, in a note to the case of the *United States* v. *Johns*,
4 *Dall. Rep.* 412. that the second member of the above section is
so inaccurately expressed, that the Attorney of the District (Mr.
Dallas) thought, at first, there must have been some error of the
press; but the Secretary of State informed him, that the printed
copy was found, upon a comparison, to agree exactly with the
roll. See the analogous English statutes, 4 Geo. I. c. 12. s. 3. and
11 Geo. I. c. 29. 1. *Abbott on Shipp.* 167, 168.

attest, Edward D. Bangs, Secretary." The copies were attached together, and exemplified under the great seal of the State of Massachusetts, with the following certificate annexed: " Commonwealth of Massachusetts. Secretary's Department, November 12th, 1825. I certify that the printed copies of the following acts, viz. ' An Act to define the Powers, Duties, and Restrictions of Insurance Companies'—' An act authorizing the several Insurance Companies in this Commonwealth to insure against Fire'— ' An act to incorporate the Boston Insurance Company'—' An act to incorporate the Commonwealth Insurance Company'—and ' An act in addition to an act, entitled, an act to incorporate the Commonwealth Insurance Company;' to which printed copies this certificate is annexed, have been by me compared with the original acts on file in this office, and that the same are *now* true copies of the said original acts, except the usual attestation of enactment, and signatures subjoined to each act. In testimony whereof, I hereunto set my hand, and have affixed the seal of said Commonwealth, the day and year above mentioned. (Signed.) EDWARD D. BANGS, *Secretary of the Commonwealth.*"

2. That before the policy of insurance underwritten by the Boston Insurance Company could be given in evidence, it was necessary to prove that the subscription to the stock, and the payment of such subscription, as required by the act of incorporation, had actually been made. The policy of insurance was admitted

in evidence by the Court below, without proof that the subscription to the stock had actually been made; it being proved that there was a company in Boston called the Boston Insurance Company, doing the business of insurance, and paying losses when incurred, and that the paper produced was executed after the manner in which they usually made their policies of insurance.

3. That the policy ought to have been proved to be executed by the authority of the company, in such manner as to be legally binding on them.

4. That the Court instructed the jury " that it was not material whether the company was incorporated or not; and it was not material whether the policy were valid in law or not; that the prisoner's guilt did not depend upon the legal obligation of the policy; but upon the question whether he had wilfully and corruptly cast away the vessel, as charged in the indictment, with intent to injure the underwriters.

The Judges of the Court below having been divided in opinion upon the motion for a new trial, the case was brought before this Court upon a certificate of that division.

Mr. *Worthington*, for the prisoner, argued, that, in order to convict him of the offence charged in the indictment, it was necessary that the policy of insurance should be a valid contract. The intent with which an act is done is not susceptible of direct proof. The only means by which it can be established is by evidence of

*1826.*

*The U. S.
v.
Amedy.*

*March 15th.*

1826.

The U. S.
v.
Amedy.

facts from which it may be directly inferred. If the probable consequence of the act done is to produce the result from which the intent is inferred, the inference may be reasonable; but when, by no possibility, the result could occur, how can a fraudulent intent be inferred? If, in this case, the policy were valid, the probable consequence of the destruction of the vessel is a prejudice to the underwriters, from which might be fairly inferred, in the absence of explanatory testimony, a design to prejudice. But if the policy was void, no such consequence could possibly happen, and no inference can arise, from it alone, of a design to produce such a consequence. The strongest analogous cases are those of forgery, in which the distinction appears clearly to have been taken. In those cases it has been determined, that where the probable consequence of the act was to defraud, the intent might be inferred. But, where such was not the case, as where the instrument was void on its face, and, therefore, could not deceive if ordinary vigilance was exerted, the intent could not be inferred.[a] Thus, where one Wall was indicted and convicted of the forgery of a will void under the statute of frauds, the conviction was held to be erroneous.[b] This question appears to have been decided in England in the

a Jones' case, 2 *East's Cro. Law*, 952.

b 2 *East's Cro. Law*, 953. Moffat's case, 2 *East's Cro. Law*, 854. 2 *Leach*, 483.

case of the *King* v. *Gillson*.[a]  In that case, the prisoner was indicted under the statute of 43 Geo. III. c. 58. s. 1. for feloniously setting fire to a house, with intent to defraud the London Assurance Company.  A policy was produced, regularly executed, covering goods in Woodstreet, on which was endorsed a *memorandum*, stating that the goods were removed to Old Boswell Court, and that the removal was allowed. This memorandum was not stamped.  The question arose, whether the written contract, being void by the revenue laws for want of a stamp, was properly admitted in evidence, and it was determined that the evidence was not admissible.  In the case of the *United States* v. *Johns*,[b] this point was decided; and the Court held, that it was necessary to prove a valid policy. If, then, the validity of the policy is essential to the offence, it becomes necessary in this case to show a legally subsisting corporation, capable of executing a valid policy of insurance, and a policy legally executed.  On the first point, it might be contended on the part of the prosecution, that though it may be necessary to prove a party actually contracting, yet that proof of a corporation *de facto* would be sufficient.  But, it was insisted, a corporation exists by its charter alone.  It is that which controls its operations, and settles the mode and extent of its obligations.  If the validity of the policy is necessary, it is surely essential to show that the

*a* 1 *Taunt. Rep.* 95.       *b* 4 *Dall. Rep.* 412.

body which executes it was legally empowered to do so, and that the act itself was performed in pursuance of those powers. This question was so decided in the case of the *United Sta es* v. *Johns.* It was insisted, that the papers given in evidence did not afford evidence of these facts, because they were described in the certificate as printed papers, whereas they are partly written; and they were so loosely attached to the paper to which the seal is affixed as not to afford satisfactory evidence that they were the papers intended to be verified. If, however, the papers should be deemed sufficiently authenticated, still it is necessary, in order to show a valid policy, to exhibit evidence that the corporation went into operation according to the terms of its charter.[a] It was also insisted. that a *corporation* was not a " person," within the meaning of the act of Congress. This point was raised in the case of the *United States* v. *Johns,* but not decided. It appears, however, to have been determined in England, in the case of the *King* v. *Harrison.*[b]

The *Attorney General,* for the United States, argued, that the evidence given of the acts of the legislature of Massachusetts incorporating the Boston Insurance Company, who were the underwriters intended to be prejudiced by the

---

a Henriquez v. The Dutch West India Company, cited in 2 *Lord Raym.* 1535.   4 *Com. Dig.* 468. note a, Am. ed.

b 1 *Leach,* 180.   2 *East's Pl. Cro.* 927. 988.

felony, was sufficient under the act of Congress of the 26th of May, 1790, c. 38. [xl.] prescribing the manner in which the public acts, &c. of each State shall be authenticated, so as to give them full faith and credit in every other State. All that the statute requires, in respect to legislative acts, is, that the seal of the State should be affixed, and that obviates every objection which had been made to the exemplification in this case.

It was further contended, that proof that the company actually carried on the business of insurance was sufficient, in a public criminal prosecution, without showing that they were legally authorized to transact it. It was immaterial whether there was a valid policy or not. The guilt of the act consists in the act itself, and the *animus* with which it was committed. It was analogous to the cases of forging a will, where the act was intended to defraud, not the party whose signature is forged, but third persons, and it turns out the testator was alive.[a] The guilt in such cases cannot depend upon the certainty that the party would have the benefit of the crime, had his attempt been successful. In the case of the *King* v. *Gillson*, the objection was not to the proof of the policy, but to the written endorsement or memorandum, which a particular statute had specially declared inadmissible in evidence unless stamped. It was, on its face, inadmissible, and the existence of the insurance

a *Hawk. Pl. Cro.* ch. 70. s. 7.    2 *East's Pl. Cro.* 948.

could not, therefore, be established. As to the requisition of proof that the conditions of the incorporating act had been complied with, it was a sufficient answer to say, that the party was estopped from denying it, by receiving a policy executed by the company. To require proof of a valid contract would be to go into the whole case as a civil action, and would require an investigation of the whole law of insurance. Whether the term " person or persons," in a statute, includes such artificial persons as a *corporation*, had never been decided in this country. The supposed authority cited in the negative,[a] was entitled to the less weight, as it rested merely upon a MS. note of Mr. Justice Buller, was decided without argument, and is contrary to the analogy of the law which regards corporations as persons for all civil purposes. Lord Coke, in commenting on the statute 31 Eliz. ch. 7. concerning the erection of cottages, where the term used is, " no *person* shall," &c. says, " this extends as well to persons *politic and incorporate*, as to natural persons whatsoever.[b] The other authorities are to the same purpose, and consider the term *persons* as including those artificial beings called corporations, as well as natural persons.[c]

Mr. *Coxe*, for the prisoner, in reply, stated,

a 2 *East's Cro. Law*, 988. 1 *Leach*, 215.

b 2 *Inst.* 736.

c 1 *Mod. Rep.* 164. 1 *Woodes. Rep.* 195. 1 *Bl. Comm* 176.

that in order to determine the questions in the case, it was important to consider the character of the offence created by the statute, and charged in the indictment.

In ordinary cases of crime, the *act* charged is, in itself, criminal; the intent to commit the offence is legally inferred from the act itself. In murder, the act of killing draws after it the legal inference of the malice prepense; in larceny, the act of taking the property of another proves the *animus furandi*, and so in other instances. The intent, or mental design, is, in all these instances, proved by the act, and this intent is co-extensive with the act done. In the present case, however, the act done by the accused is innocent and legal in itself. He was the owner of the vessel—so charged in the indictment. In that character he might destroy his own property without being chargeable with any evil disposition or design. The simple act of destruction is, then, evidence of no criminality. Whence, then, does the criminality arise? From the intent to prejudice the underwriter. This intent is the hidden operation of the mind, legally to be inferred from certain facts positively proved. Those facts, which alone can warrant this inference, are, first, that such a person *exists* as the indictment charges that he designed to prejudice; second, that such person was in the situation which made such act likely to prove prejudicial. The first, therefore, requires that such a party should be in existence; the second, that his relation should be proved to subsist.

It is essential, then, that it should appeai in proof that there was such a corporation as the *Boston Insurance Company*, because, unless such a party existed, the law cannot infer the design to prejudice it. It is equally essential that a valid policy of insurance should be proved, because, unless that party was placed in the situation in which it could be injured by the destruction of the vessel, it is impossible that such a design can be inferred.

These circumstances, then, are of the very essence of the crime charged, and must be established by plenary proof. How, then, is the existence of the corporation to be proved? In cases in which it is a plaintiff, it must also prove its existence; and this is to be done by the production of the charter, or the act of incorporation.[a] It cannot be pleaded in abatement by a defendant, sued by a corporation, that there is no such corporation, because, as that fact must be necessarily proved as part of the title, it is included in the general issue. In the case of the *United States* v. *Johns*,[b] (more fully, as to this point, reported in a MS. statement of the case by Mr. Justice Washington,) on an indictment under this act of Congress, proof of the act of incorporation was required and produced.

That there should be a valid and subsisting policy is equally essential. Unless there was such a policy, covering the identical property, upon the very voyage in which the vessel was en-

---

*a* 2 *Lord Raym.* 1535.          *b* 4 *Dall. Rep.* 412.

gaged, covering such a risk, and known to the accused, the law cannot intend that he designed to prejudice the underwriter.   The rule of law is, that if every fact laid in the indictment may be true, and yet the accused may be innocent of any offence, the indictment is defective.[a]   If essential to lay it in the indictment, it is equally essential to establish it by testimony.   Unless, therefore, it be proved, that there was a valid policy, there could be no underwriter who could be injured.   There might be a policy covering the vessel against capture by the enemy, against destruction by fire, upon a different voyage from that which the vessel was pursuing.   Under such circumstances, the law would not infer the intention to prejudice the underwriter.   The case of the *King* v. *Gillson*,[b] appears decisive of this question, so far as its authority is recognised. And, in the case of the *United States* v. *Johns*, the Court held, it was essential to prove a valid subsisting policy.

As to the supposed analogous cases of forgery cited on the part of the prosecution, all cases of forgery necessarily imply, that the instruments are in themselves invalid; that they are false in reality is of the essence of the crime, which consists in the representation of such void instruments to be valid, with intent to deceive somebody.   Such deception is practised upon third persons, not upon those whose names are forged. Were a man indicted for representing a forged

a *Dougl. Rep.* 153.          b 1 *Taunt. Rep.* 95.

will to be a genuine one, with intent to defraud a person shown to be dead, or never to have been *in rerum natura*, it might bear upon the former point raised in this case. Upon this point they can have no bearing whatever. Unless the instrument charged to be forged is proved to be false, there can be no conviction for forgery. Unless, in this case, the policy is proved to be valid, we insist the same conclusion follows. The essence of that crime is the representation of a false instrument to be a genuine one ; the gist of the offence here is, that a party was in such a predicament that he might be injured by the act of the prisoner, and, consequently, that the policy was a valid one. The deception in that case might be equally successful, and, therefore, equally injurious, whether the bill purported to be made by a dead man or by a living one, whether the person who purported to be the drawer of a bill of exchange, was in existence or not ; and, therefore, that circumstance could make no difference. In this case, no person could be injured unless there was a valid policy of insurance, and, therefore, the proof of such policy is essential. If it be essential that a valid policy should be proved, (which, in itself, includes the proof of a legally subsisting corporation,) in what manner, and by what species of evidence, is this to be made out ? By producing the act of incorporation or charter. Was, then, the exemplification of the acts of the Massachusetts legislature, in this case, sufficient ? The statute of Congress directs, that the legislative acts of

the several States should be proved by the an-
nexation of the great seal. But this provision
was merely in affirmance of the common law,
and was not designed to dispense with any of
the rules of the common law. The seal of the
State proves itself, and may also prove the truth
of the certificate which it purports to sanction,
but that certificate ought to show, in its terms,
that it was affixed by some one having authority
to affix it. These papers are, evidently, from
the face of them, torn from some printed book,
full of erasures and interlineations not enume-
rated in the certificate. These printed papers
are not connected directly with the seal. The
seal is on a distinct piece of white paper, and by
a single thread these pretended acts of the legis-
lature are connected with that. Some essential
parts are again connected with those through
which the thread passes by wafers. Does the
seal prove these? If a thread or wafer were
now to be used to connect either, or any of these
sheets, with a newspaper, it would be equally well
authenticated. These acts are not fully given.
They do not include the evidence of enactment,
nor do they contain the attestation of those offi-
cers whose signatures are essential. These are
constituent parts of every legislative act. They
are all upon the original rolls. The evidence
offered is, then, merely of extracts, or parts of
the acts, not entire copies.

It is not only essential that the act should be
exhibited, but it should also be proved that the
Company went into existence, and continued to

subsist.   The grant of the charter must be accepted by the voluntary consent of those whom it designed to incorporate, otherwise it will be void.[a]   The corporation might also have become extinct,—it may have been dissolved,—the charter may have been forfeited.

As to the question whether a corporation is a *person,* within the meaning of the act of Congress,  the case from *Leach* and *East* is the only case which has been referred to, in which the question has occurred in a criminal prosecution. It has been suggested, that it is doubtful whether such a question was, in fact, decided.  *East* states it positively ; in the last edition of *Leach,* the assertion is reiterated, and it is sanctioned by the last editor of *Comyn's Digest,* and other authorities.[b]

*March 16th.*   Mr. Justice STORY delivered the opinion of the Court.

The first question for consideration is, whether the evidence of the act of incorporation of the Boston Insurance Company, disclosed upon the record, was admissible as a sufficient verification thereof.   It is matter of most serious regret, than an exemplification so loose and irregular, should have been permitted to have found its way into any Court of justice.   As it has, it is our duty to decide upon its legal sufficiency.   It

a 4 *Com. Dig.* 468.  Note (a) Am. ed.
b 4 *Com. Dig.* Note (t).  *Russell on Crimes,* 1495.

is under the seal of the State, and verified by the signature of its Secretary.

1826.

The U. S.
v.
Amedy.
Evidence of the act of incorporation sufficient.

It is said that this is not enough, and that it ought to be shown, that the Secretary had authority to do such acts. This objection must be decided by an examination of the act of Congress of the 26th of May, 1790, prescribing the mode in which the public acts, records, and judicial proceedings of each State, shall be authenticated, so as to take effect in every other State. That act provides, "that the acts of the legislatures of the several States, shall be authenticated by having the seal of their respective States affixed thereto." No other or further formality is required; and the seal itself is supposed to import absolute verity. The annexation must, in the absence of all contrary evidence, always be presumed to be by a person having the custody thereof, and competent authority to do the act. We know, in point of fact, that the constitution of Massachusetts has declared, "that the records of the Commonwealth shall be kept in the office of the Secretary." But our opinion proceeds upon the ground, that the act of Congress requires no other authentication than the seal of the State.

The other objections to the exemplification are, that the acts are printed copies, with erasures and written interlineations, not so annexed as to afford perfect certainty that they are the identical copies to which the Secretary's certificate was originally annexed. We think these objections cannot be maintained in point of law.

1826.

The U. S.
v.
Amedy.

The copies must be presumed to be the original copies, in the same state in which they were originally annexed. Any subsequent alteration or subtraction would be a public crime of high enormity ; and the commission of a crime is not to be presumed. The certificate of the Secretary, taken together, shows that he did not mean to state that the printed copies had not been varied by writing, so as to be true copies, for he adds the phrase, they are now true copies of the original acts. The original print is still visible throughout, and the alterations in writing are mere verbal alterations, not in the slightest degree varying the sense or effect of any single clause in which they occur ; and, to afford additional proof of identity, the Secretary has on each copy annexed his own signature, with an attestation of its being a true copy. There is, therefore, no presumption, from the face of the papers, or otherwise, of any alteration or addition since the seal of the State was annexed. The annexation of the usual attestation of the enactment and signatures to the acts was not necessary. It is sufficient that their existence and time of legal enactment is shown.

Our opinion, therefore, upon this question is, that the papers were properly admitted in evidence.

The next question is, whether before the policy of insurance, underwritten by the Boston Insurance Company, could be given in evidence, it was necessary to prove that the subscription to the stock, and the payment of such subscription

as required by the act of incorporation had been made. In our opinion, it was not. This is not the case where a suit is brought by the corporation to enforce its rights, where, if the fact of its legal existence is put in controversy upon the issue, the corporation may be called upon to establish its existence. The case of *Henriques and Van Moyses* v. *The Dutch West India Company,* cited in 2 *Lord Raym.* 1535. as decided before Lord King, whatever may be its authority, was of that sort, and, therefore, carries with it an obvious distinction ; nor is this the case of a *quo warranto*, where the government calls upon the company to establish its legal corporate powers and organization. The case here is of a public prosecution for a crime, where the corporation is no party, and is merely collaterally introduced as being intended to be prejudiced by the commission of the crime. Under such circumstances, we think, nothing more was necessary for the government to prove, than that the company was *de facto* organized, and acting as an insurance company and corporation. The very procurement of a policy by the prisoner, to be executed by the company, was of itself *prima facie* evidence for such a purpose. In cases of the murder of officers, it is not necessary to prove that they are officers by producing their commissions. It is sufficient to show that they act *de facto* as such. In cases of piracy, it has been held sufficient to establish the proprietary title to the ship by evidence of actual possession of the party claiming to be owner.

1826.

The U. S.
v.
Amedy.

Not necessary to prove a compliance, on the part of the corporation, with the terms of its charter. Its actual existence sufficient.

1826.

The U. S.
v.
Amedy.

*Actual execution of the policy by the known officers of the company de facto, sufficient.*

*Question upon the instructions of the Court to the jury.*

These are analogous cases, and furnish strong illustrations of the general principle.

The same answer may be given to another objection, and that is, that the policy ought to have been proved to be executed by the authority of the company, in such manner as to be binding on them. The actual execution of the policy by the known officers of the company *de facto*, is sufficient.

The next question arises upon the instruction of the Court, " that it was not material whether the company was incorporated or not; and it was not material whether the policy were valid in law or not; that the prisoner's guilt did not depend upon the legal obligation of the policy; but upon the question whether he had wilfully and corruptly cast away the vessel, as charged in the indictment, with intent to injure the actual underwriters." We think this opinion correct. The act of Congress of the 26th of March, 1801, ch. 40. on which this indictment is framed, declares, " that, if any person shall, on the high seas, wilfully and corruptly cast away, &c. any ship or vessel, of which he is owner, &c. *with intent or design to prejudice any person or persons that hath underwritten, or shall underwrite, any policy or policies of insurance thereon*, &c. the person or persons offending therein, &c. &c. shall suffer death. The law punishes the act when done with an intent to prejudice; it does not require that there should be an actual prejudice. The prejudice intended is to be to a person who has underwritten, or shall underwrite, a policy thereon, which, for aught the pri-

soner knows, is valid; and does not prescribe that the policy should be valid, so that a recovery could be had thereon. It points to the intended prejudice of an underwriter *de facto.* The case of the *King* v. *Gillson,* (1 *Taunt. Rep.* 95. 2 *Leach,* 1007.) did not turn upon this point. That was an indictment for maliciously setting fire to a house, with intent to defraud the London Assurance Company of houses and goods from fire. It was necessary to prove that the household goods in the house had been actually insured for the prisoner by the company. A policy had been executed by the company, on these goods, in another house, and subsequently, upon the removal of the prisoner to the house set on fire, a memorandum was endorsed on the policy, agreeing that the removal of the goods should be allowed. This memorandum was unstamped, and by statute was not admissible in evidence. Six Judges against *five* held the evidence inadmissible, upon the ground that the prohibition was intended to be universal. The existence, therefore, of the insurance itself, could not be established. If there had been proof that the policy was executed, the question might have arisen, whether it was necessary further to prove its legal validity in all other respects. The argument at the bar, drawn from the known law as to forgeries, is, we think, pertinent. In those cases, when they depend on the common law, actual prejudice is not necessary to be proved; and, of course, the validity of the instrument is entirely waived.

1826.

The U. S.
v.
Amedy.

The term *person or persons,* in the act of Congress, extends to corporations and bodies politic.

Another question, not raised in the Court below, has been argued here, and upon which, as it is vital to the prosecution, we feel ourselves called upon to express an opinion. It is, that a corporation is not a *person* within the meaning of the act of Congress. If there had been any settled course of decisions on this subject, in criminal cases, we should certainly, in a prosecution of this nature, yield to such a construction of the act. But there is no such course of decisions. The mischief intended to be reached by the statute is the same, whether it respects *private* or *corporate* persons. That corporations are, in law, for civil purposes, deemed persons, is unquestionable. And the citation from 2 *Inst.* 736. establishes, that they are so deemed within the purview of penal statutes. Lord Coke, there, in commenting on the statute of 31 Eliz. ch. 7. respecting the erection of cottages, where the word used is, " no *person* shall," &c. says, " this extends as well to persons *politic* and *incorporate,* as to natural persons whatsoever." In the case of the *King* v. *Harrison,* (1 *Leach,* 180. 2 *East's Pl. Cro.* 927. 988.) it may, perhaps, be matter of some doubt, whether the point was actually decided by the Court. But, if it was, it mainly rested upon a peculiarity of construction which grew out of the statute of 31 Geo. II. ch. 22. s. 78. which professed to cure doubts of the meaning of these words in other antecedent statutes upon similar subjects, leaving that on which the indictment was framed untouched. Finding, therefore, no authority at

common law, which overthrows the doctrine of Lord Coke, we do not think that we are entitled to engraft any such constructive exception upon the text of the statute.

Upon the whole, it is to be certified to the Circuit Court of Virginia, that the decisions of that Court, upon the points of law arising at the trial, were correctly decided.

CERTIFICATE. This cause came on to be heard on the certificate of division of opinions of the Judges of the Circuit Court, &c. On consideration whereof, it is ADJUDGED by the Court, that it be certified to the said Circuit Court, that the points of law ruled by the said Circuit Court at the trial of the cause, and upon which the same Court, upon a motion for a new trial, were divided in opinion, were, in all respects, correctly decided by the said Court at the said trial.