## CONTROL AS TO BRIDGES OVER NAVIGABLE WATER-WAYS.

[Circuit Court of Ashtabula County.]

THE STATE OF OHIO, EX REL LEWIS HARPER, A TAX-PAYER, v. THE COMMISSIONERS OF ASHTABULA COUNTY.

Decided, September Term, 1905.

*Constitutional Law—Authority of Secretary of War—Over Bridges Obstructing Navigable Water-ways—Jurisdiction—State Courts may Enjoin County Commissioners from Carrying Out Order of Secretary of War, When—County Bridges Over Navigable Streams where Wholly within the County—Tax-payer may Enjoin the Tearing Down of Bridge, Change of Channel, and Levying of Tax to Meet the Expense Thereof, When.*

1. The Secretary of War has no authority to order and compel the commissioners of a county to remove an established bridge over a navigable river wholly within the limits of the state, and rebuild it in such a manner as to change the course of the river by straightening the same at the point in question, thereby throwing the channel fifty feet to the east.

2. Such secretary can not require commissioners to tear down such bridge upon the ground that it is an unreasonable obstruction to the free navigation of such river without tendering compensation therefor.

3. The bridge in question having been lawfully erected by the county of Ashtabula over a navigable stream wholly within such county, and before the Congress attempted to confer such authority upon such secretary, the courts of the state have jurisdiction over such bridges and may enjoin the commissioners of such county, on the · petition of a tax-payer, from carrying out such order of such secretary, and from tearing down and removing such bridge and building a new and different one in its place, and changing the channel of such stream, and from issuing bonds and levying a tax to pay the expense thereof.

LAUBIE, J.; COOK, J., concurs in a separate opinion; BURROWS, J., dissents.

The case of the State of Ohio, ex rel Lewis Harper, a tax-payer, against the Commissioners of Ashtabula County, is here upon error, and presents to us a very grave question,

In the court of common pleas a demurrer was sustained to the petition and the case dismissed, which is the error complained of.

While Judge Cook agrees with me in the reversal, the reasons upon which I base it are my own. His reasons are stated in a separate opinion.

The action was brought to restrain the commissioners from issuing bonds and levying a tax to the amount of $200,000, for the purpose of removing a bridge over Ashtabula river, constituting a part of Bridge street in the city of Ashtabula, in this county, and building a new one in place thereof—a bridge that it is conceded is appropriate for the place, in perfect order and condition, not even needing any repairs, and not in any manner obstructing navigation and being but a short distance north from the navigable end of said river, which runs north into Lake Erie. What right have they to do it? They stand here declaring that they have the right, and insisting upon that right.

There must be some legal right given them, under some provision of law, to tear down a perfect bridge, constituting part of a principal street of a city, under the facts stated, and build a new one at this immense expense to this county.

There is no doubt of their right of control of the bridge and they claim the right in question by virtue of a statute of this state passed March 24, 1904 (97 O. L., 53), evidently passed to meet this case, and principally, it is claimed, through the influence and for the benefit of the railroad companies that have built docks on the east bank of this river, south of the harbor proper, not only to but south of the bridge; the east bank is low and level, but the west bank is hilly and uneven along the point in question.

This part of the city is on the lake front, and is north of, and separated from, the main part of the city by one and a half miles of farm lands, and the navigable portion of the river ends about half way between these sections of the city; and the bridge in question constitutes part of the main street of said north section, and is the only people's bridge across the river at this important section of the city.

Section 1 of said statute is as follows:

"Section 1.   That the county commissioners of any county having control of any bridge or bridges which have been condemned or ordered removed by the War Department of the United States, under authority of law, as an obstruction to navigation, shall have power to remove such bridge or bridges and to rebuild or replace the same or construct a new bridge or bridges over the stream or streams crossed by the bridge or bridges so condemned or ordered removed; and for this purpose such commissioners shall have power to purchase or appropriate property, in the manner provided by law, to widen the channels of such stream or streams."

And Section 2 provides how they may issue bonds and levy a tax for this purpose.

The defendants claim that this statute not only confers upon them the power claimed, but that they are compelled to exercise it by reason of the fact that the Secretary of War has condemned this bridge as an obstruction to navigation, and ordered them to remove and rebuild it, as apparent from the allegations of the petition, and from the original order of the secretary, which they submit to us for consideration.

And yet counsel for defendants assert against the right of the plaintiff to the injunction asked for, that it does not appear from the allegations of the petition that the bridge in question is a county bridge.

If this assertion was correct and if this is not a county bridge, the commissioners could not have any control over it, and could not be required to remove and rebuild it at this expense to the county, and the injunction asked for should be granted without further consideration.   Such a claim deserves no consideration at our hands.   The statute they rely upon could not be construed to include any but county bridges; and they, as well as the Secretary of War, have been acting on the assumption that it is such a bridge.

We are, therefore, compelled to ascertain, first: whether such order was made by the Secretary of War; and, second, if made, did such secretary have the authority to make and enforce it.

The facts as stated in the petition and, therefore, admitted to be true, and supported by the terms of such original order, are that the secretary had ordered the commissioners merely to alter said bridge by removing the center pier, as it is called in the order, from the river, because it is an obstruction to navigation, and to dredge at that point to a depth of twenty-one feet below the mean level of Lake Erie, which of course would have the effect of widening the channel of such stream the width of such pier as it is admitted to be on the east bank of the river, and upon which this bridge swings.

Was that an order condemning this bridge as a whole and ordering its removal?

In one sense, it is a condemnation of the bridge, but the order directs only an alteration of it, by removing the so-called center pier.

Defendants claim that such order in effect required them to remove the whole of the bridge; that the removal of the so-called center pier would destroy the bridge as a whole; that it could not thereafter be repaired and restored.

Such effect or intention is not apparent from the order and would have to be established by proper evidence in defense.

If such was the order in effect, it would render the next question in this case less difficult perhaps of solution.

That question—the main and decisive question in this case— is: Could the Congress confer, and did it confer, upon the, Secretary of War the authority to make and have enforced such order?

This question is in no wise affected by the action of the Ohio Legislature in passing the statute of March 24, 1904. First, because the effect, legality and constitutionality of acts of Congress and of the state legislature, are matters for the courts to determine; and the action of such legislature would be a mere nullity if the Congress did not, or could not, vest such power in the Secretary of War. Secondly, because the act claimed to confer upon such secretary the authority in question, provides that it is only the "lawful order" of such secretary that may be enforced; and because such Ohio statute also provides for, and confers upon, the commissioners authority

to act only in cases wherein such secretary has the power "under lawful authority" to make such condemnation. In other words, that such power has been lawfully conferred upon such secretary; and that is the main question in this case. If Congress did not, or could not confer such authority upon such secretary, the commissioners could not exercise the power specified in the Ohio statute, and could not be held civilly or criminally responsible for disobeying such order; and could be enjoined from obeying it in a proceeding like this.

The authority conferred upon the Secretary of War in such cases is in the act of March 3, 1899 (30 U. S. Stat. at L., 1121), which superseded Sections 4, 5 and 7 of the act of September 19, 1890 (26 U. S. Stat. at L., 426).

Section 4 of said last-named act was the one that defined the power conferred upon the secretary in such cases, and the wording of Section 18 of the act of 1899, which superseded said Section 4 conferring such power upon such secretary, is in precisely the same words, except that it provides the alterations directed by the secretary to be made in the structures shall be such as are recommended by the chief engineer of the department.

Said Section 18 also supersedes said Section 5 of said act of 1890, making the willful refusal or neglect to obey the lawful orders of such secretary a misdemeanor, and provides:

"If the persons, corporation, or association owning or controlling any railroad or other bridge * * * willfully fail or refuse to remove the same, or to comply with the lawful order of the Secretary of War in the premises, such person, corporation or association shall be deemed guilty of a misdemeanor, and punished by a fine not to exceed five thousand dollars; and every month such person, corporation or association shall remain in default * * * shall be deemed a new offense."

It will be noticed that in this part of said Section 18 of said act of 1899, the word "association" is added to the words "persons, or corporations," used in the previous part of said section and in the original act, in defining the owners or controllers of such railroad or other bridge.

Section 7 of said act of 1890 related to the building of bridges in the future.

The bridge in question here was built in 1889 by the county of Ashtabula, through its commissioners, under authority from the state, and the Ashtabula river is wholly within the state of Ohio, and is only navigable for about three-fourths of a mile south from Lake Erie.

The effect of the act of September 19, 1890, hereinbefore referred to, upon the rights of the state, and the jurisdiction of the state courts, over such structures, was determined in the case of *The Lake Shore & Michigan Southern Ry. Co.* v. *The State of Ohio*, 165 U. S. R., 365.

The railroad company had built a solid bridge over the river in question here, a short distance south of this bridge; and the proceeding was in quo warranto upon the part of the state to compel the company, upon the ground that the bridge was a public nuisance in that it obstructed navigation, to remove the bridge, or to so change it, by making a draw span, that navigation would not be obstructed, and such was the order of the state courts in the case.

The defense set up by the company was that the Ashtabula river was a navigable water-way of the United States; that the act of Congress of 1890 had taken away the right of the state as to all structures on or over such water-ways and that the state courts had no jurisdiction of the subject-matter.

Section 4 of said act of 1890, which was simply re-enacted in Section 18 of the act of 1899, as heretofore stated, was as follows:

"That whenever the Secretary of War shall have good reason to believe that any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable water-ways of the United States, is an unreasonable obstruction to the free navigation of such waters on account of insufficient height, width of span or otherwise, or where there is difficulty in passing the draw opening or the draw span of such bridge by rafts, steamboats or other water-craft, it shall be the duty of said secretary, first giving the parties reasonable opportunity to be heard, to give notice to the persons or corporations owning or controlling such bridge so to alter the same as

to render navigation through or under it reasonably free, easy and unobstructed; and in giving such notice he shall specify the changes required to be made, and shall prescribe in each case a reasonable time in which to make them.''

The Supreme Court affirmed the action and order of the state courts, and held that full power resided in the state as to the erection, removal or modification of bridges and other structures in navigable streams wholly within the limits of the state, in the absence of the exercise by Congress of authority to the contrary. That the act of 1890 not only did not abridge that power, but recognized its existence, and did not confer upon the secretary the right to determine when and where a bridge may be built. That the state court had jurisdiction, that it was not necessary to decide, and the court did not decide, whether the Ashtabula river was a water-way of the United States or not; and that said act of 1890 simply created an additional remedy to prevent such structures from interfering with commerce; that is, interstate commerce.

It is settled, therefore, that the power of the state, and the jurisdiction of its courts over the then existing bridges on this river, have not been taken away by the acts in question; nor have they been by any other acts subsequently passed by the Congress, if they could be, but remain intact; and as the bridge in question here was built by this county under authority from the state in 1889, the pertinent question arises: Could Congress delegate to the Secretary of War the power to find and adjudge that the Ashtabula river is a water-way of the United States, and that such bridge is an unreasonable obstruction to the free navigation of said river, and to order the county of Ashtabula, through its commissioners, to change and alter said bridge by destroying one of its piers, and to widen the channel of said stream by dredging at that point to the depth of twenty-one feet below the mean level of Lake Erie, and to rebuild said bridge according to the plans and specifications furnished by the secretary, and within the time prescribed by him.

We have seen that the Supreme Court of the United States refused to pass upon the question whether this river was a water-way of the United States or not.

It seems as if the court had doubts upon the question, or it would not have hesitated to hold that such stream was a water-way of the United States, as the question was made and relied upon by the railway company.

But, how could Congress delegate the power, and confer the judicial functions specified in said Section 4 of said act, and as re-enacted in said Section 18 of the act of 1899, upon a mere government official, functions belonging only to courts under the provisions of the Constitution, which provides that the personal rights of citizens, and their property, can not be taken from them, confiscated or destroyed, save upon just compensation, and by due process of law.

The Congress is like any other representative body, and if it could, as a legislative act, make such finding and order itself as to this stream and bridge, it could not delegate such legislative power to a government official.

In support of the constitutionality of the act, it is claimed that the authority conferred upon the Secretary of War by the act in question to determine what is an obstruction is merely administrative in its character—simply to aid Congress in carrying out its legislative action, and not an authority to fix or make the law.

In what sense are such duties thus cast upon the secretary administrative, and that the secretary not thereby authorized to fix or make the law?

Here the whole power to find and adjudge such river to be such water-way, and such bridge to be an unreasonable obstruction to such water-way, and to order its alteration, is vested solely in the secretary, and his action is final; and the owner is subject to a criminal action under the provisions of such act if he refuses or neglects to obey such order.

If such power is merely administrative, why would it not also be conferring administrative power to authorize the secretary to fine the owners of such bridge for refusing or neglecting to obey the secretary's order, instead of appealing to the courts. If he may make such findings himself and compel the owner to destroy part of such valuable structure, and expend his own money in rebuilding it, why could he not hold in con-

tempt and impose a fine on such owner for refusing to obey the order?

The powers thus attempted to be conferred upon such secretary are not legitimately legislative either in their character, but judicial solely, to be conferred upon, and exercised by the courts alone; that is in part, as some of these powers even courts could not exercise.

While the Supreme Court of the United States, as in the case cited, has passed this act by as valid, yet its validity was not then and has never been questioned and brought to that court for consideration and decision.

The lower courts which have held it constitutional, in support thereof have held that "the power to determine what shall or what shall not be in law an obstruction to navigation is vested in Congress," and "Whether a thing obstructs navigation or not is a question not of law, but of fact." Well, the same might be said of any crime, as the statutes define what constitutes a crime. If this assertion were true, it would be immaterial. But I can not see why the questions whether a river is a water-way of the United States, and whether a bridge over it is an unreasonable obstruction to navigation, are not mixed questions of law and fact.

In *Chatfield Co.* v. *City of New Haven*, 110 Fed. Rep., 788, and *United States* v. *Union Bridge Co.*, decided recently in the District Court for the Western District of Pennsylvania, the district judges held this act constitutional on the ground that it had been so decided by Judge Grosscup, in *United States* v. *City of Moline*, 82 Fed. Rep., 592; and which is the case relied upon here for the same purpose.

Those courts were mistaken, as well as counsel here, as to the effect of the holding in City of Moline case. It was a peculiar case, and Judge Grosscup held that while the act in question was unconstitutional in its general application, it was constitutional as applied to the case he had in hand, for the reason that the Legislature in the grant to the company of the right to build the bridge had reserved the right to compel the company to alter it to a draw-span bridge at any time in the future, and that, therefore, the successor to the franchise, the city, had no

right to compensation, although the order was made by the Secretary of War as Congress had declared the stream to be a water-way of the United States, and had succeeded to the rights of the state in regard to the bridge.

The opinion is as peculiar as the case. On page 598 it is said:

"The proposition as to the validity of the act presents two questions:

"First. Is the bridge an obstruction to navigation? Second. Is it there by any such legal right that the government may not interfere with it in the respect designated without just compensation?

"The first question is purely administrative, and Congress can delegate the power to the Secretary of War.

"A thousand questions of equal moment to the parties interested, and of equal difficulty, are necessarily delegated to the great departments every month. In the very nature of things, Congress can not dispose of them. A government of the size of this, operated upon such a conception, would be clogged immediately."

A peculiar reason for giving such power to the War Department instead of the judicial. The learned judge proceeds:

"The second question is undoubtedly judicial, and for that very reason is not subject, constitutionally, to the decision of Congress any more than of the Secretary of War. If the bridge is there by legal right—if it be a franchise or property that can not be taken except after just compensation—Congress is powerless, either by general or special acts, to touch it. In the face of such property right Congress is as helpless as the War Department."

At the close of the opinion the judge, referring to the criminal action provided for in the act, says:

"The right of appeal to the judiciary in all questions in their nature judicial is preserved in the sections of the statute under discussion.

"The Secretary of War has no power to carry out his decision respecting these obstructions except through a court. Any question, whether of law or fact, essentially judicial, may be raised under these informations. A court of the United States stands always, by the clear provisions of the act, between the decision of the Secretary and its execution.

"There is, therefore, in the act no delegation of judicial power to the secretary that is not open to review in the courts. I hold, therefore, that the act, so far as it is applicable to the case in hand, is constitutional and valid."

It is evident, therefore, that he held the act constitutional only so far as the case he had before him was concerned, and on the ground I have stated—that the defendant was not entitled to compensation.

But that is a legal question, to be determined before the order to alter the bridge is made, and could not be decided by the secretary, and the criminal case is only to punish the party for not obeying such order.

The right involved in this second question, conferred upon the secretary by the act, he declared was *undoubtedly judicial* as to such legal bridges, and it is impossible to believe that he intended to hold, and was holding, that the act was constitutional as applied to any and all bridges and their owners, because such owners, when prosecuted criminally for disobeying the order, might plead the unconstitutionality of the act as a defense.

But how could that make the act constitutional? Every act is subject to review by courts, and if that would make them constitutional, the review would be useless. But in such case the court simply would have to hold that the act was unconstitutional, and discharge the defendant, if the authority conferred upon the secretary was undoubtedly judicial, as declared by Judge Grosscup, as to bridges included in his second question, and which could not be conferred upon the secretary, nor exercised by Congress itself; and consequently the action of the secretary would be absolutely void.

"Oh yes," in effect, say the defendants here, "but it can be adjudged unconstitutional only by the court in the criminal case provided for in the act; and as we have agreed to obey the order, tare down the bridge and rebuild it, no criminal action can be brought, and the county or its tax-payers can not interfere, consequently the act is constitutional as to this bridge."

Is such an argument entitled to any consideration?

But the test put by Judge Grosscup necessarily eliminates from consideration some very important elements.

His second question, or test, eliminates the constitutional provision, that the civil rights of citizens and their property, can not be taken from them except by due process of law, and the action provided for in this statute is a direct violation of such provision. It is a criminal action, to be instituted at the instigation of the secretary, to have the owners of such bridge punished for refusing or neglecting to obey his order.

The first question, or test, also eliminates an important proposition.

Instead of such test being whether such bridge is an obstruction to navigation, as he puts it, it should be whether it is an *unreasonable* obstruction, as declared in the act in question of March, 1890, which was passed to amend the original act of August 11, 1888, by the insertion of the word unreasonable, so as to make it read "unreasonable obstruction," so that a bridge constituting a reasonable obstruction could not be ordered removed or altered.

The determination of what is an unreasonable obstruction as contra-distinguished from a reasonable one, clearly involves a question of law as well as of fact, just as in the determination of what is a reasonable time in which to perform an act as contra-distinguished from an unreasonable time, which all courts hold involves a question of law as well as of fact; and time and again have set aside the verdict of juries on that very ground, their verdict being contrary to what, in the eye of the law, would be a reasonable time; and on that ground the act in question has been held unconstitutional.

In *United States* v. *Bridge Co.*, 45 Fed. Rep., 178; and *United States* v. *Commissioners of Muskingum Co., Ohio*, 50 Fed. Rep., 406, the courts held the act unconstitutional because the power to determine whether a lawfully erected bridge was an *unreasonable* obstruction to navigation was a judicial function—a mixed question of law and fact—which even courts could not determine without a constitutional jury; and could not be relegated to any subordinate authority or person.

How is it possible, under the provisions of the Constitution, for Congress to confer upon the War Department the authority to determine that a state, a county, a person or corporation has no legal right to maintain an established bridge over a river, and to order and compel such owner to tear it to pieces, change and alter it according to plans and specifications furnished by such department.

If it can confer such authority in such cases, why may not Congress confer upon the Secretary of War the power to hear and decide all cases where the rights of the general government and a state or its citizens or others, come in conflict?

To find and adjudge that a stream wholly within one state, and navigable less than a mile, is a water-way of the United States, when the Congress had not defined what constitutes such a water-way, and that a drawbridge over the same, lawfully constructed by the county where such navigable portion lies, under authority from the state before Congress restricted such right, and constituting part of a street of a city, with a draw-span the full width of the stream, is an unreasonable obstruction to the free navigation of such stream, and to order certain parts of such bridge to be torn down and removed because thereof, is clearly the exercise of judicial functions belonging only to courts, and can not be conferred upon and exercised by a mere government official, even as against private parties, let alone a civil division of a state. Beyond question it is condemning a lawfully erected structure, the property of a civil division of a state, as a public nuisance and ordering its removal by such owner, which can only be done by the finding of a constitutional jury or the judgment of a jurisdictional court, upon a specific legal indictment, complaint or other judicial procedure.

It is the compelling of a county, a civil division of a state, second only to the state itself, to destroy the efficiency and value of its property, not only without due process of law, but without compensation, and at its own expense, which in no event could legally be done unless such a structure was adjudged to be a public nuisance, as in the case of *Railway* v. *Ohio, supra,*

In whom can such authority be vested but the established courts of the government having jurisdiction over the subject-matter, and upon no other ground could the county, through its commissioners, be required to destroy the usefulness and value of such lawfully erected structure, by tearing away a valuable and necessary part thereof without compensation, and at its own expense.

Compelling the county to tear away and destroy a valuable part of its bridge, to the injury of the whole, and at its own expense, leaving out of view the rebuilding of it, on the mere order of a government official, evidently is the taking of the property of such county, and without due process of law. To compel one thus to destroy not only the efficiency but the existence of his property, deprives him of that property, and of the money required to pay for doing the work, and therefore, in effect, takes the property and money from him, and without due process of law.

It is immaterial upon what ground it is done. If because of its being a public nuisance, or, casting aside such name, because it is claimed to be an obstruction to navigation, it only can be done by due process of law.

And that is not all. The act in question authorizes the secretary to do this without finding that such structure in fact is an unreasonable obstruction to the free navigation of such streams. All he is required to do is to declare, as he has in this instance, that he has good reason to believe that it is such an obstruction. Such belief would authorize a court or a jury to find as a fact, and adjudge such bridge to be such an obstruction, but without such finding and judgment, such declaration would avail nothing.

Congress can not constitutionally confer even upon courts the right to order the destruction in whole or in part of a lawfully erected and valuable public structure like this without such finding and judgment.

But if Congress can delegate such power to the Secretary of War, and the act in question is valid, the result is the same. The act does not confer authority on such secretary in regard to bridges owned by a county, a civil division of a state.

In construing a statute, where a particular matter or thing is named, followed by general words to include generally such matters or things, such general words are held only to mean and include matters and things of a similar nature to those specially named. And "or other bridges," in this act means bridges similar to the ones specifically named, to-wit, railroad bridges, and therefore only include such as are owned or controlled by railroad or other private corporations, and not such as are owned by a civil division of a state, and controlled by its representatives. The whole act sustains this construction, as its provisions apply solely to individuals, railroad and other corporations and associations of a commercial or private character, as contra-distinguished from other bodies, as a state, or its divisions, like a county. While county commissioners control county bridges, they do it merely as representatives of the county, and not as individuals or as a corporation or association.

The granting of power to "persons, corporations or associations" to build bridges and maintain them, by the United States, or a state, could never be construed to mean and include counties or their commissioners; nor can the statute in question be construed differently.

County commissioners can not perform a duty or an act except such as the state authorizes them to perform as and for the county they represent as a part of the state.

They have nothing to do with such matters personally as individuals, or as a corporation or association, and are not included within the legitimate, legal and ordinary meaning of such names. And I think the act in question, which must be construed strictly, under the well settled rules of law, can not be construed as conferring upon the secretary authority to take action in regard to bridges that were lawfully constructed by such civil division of a state simply because the control of such bridges is vested by the state in such officials. Nor do I think Congress had in view, or intended to include, such bodies as county commissioners in the passing of such acts. Although such bodies may in some of the states, as in Ohio, have control of county bridges, they could not be held to obey such orders if, as a body, they have no money which they could devote to such

work, and no right or authority to raise it for that purpose; and there is not a county in the states where the commissioners have such authority unless given in some special statute passed at the instance of interested parties, as claimed in this instance.

No such general power is vested in them and the Congress knew it, and could not have intended to include such commissioners in the phrase ''corporations or associations.''   Nor was Congress so ignorant of the meaning of these words, that it believed, or could be induced to believe, that a civil division of a state, or its representatives, were included in such designations.

But if such act includes county commissioners, where can be found the authority to support the claim that such secretary, or the Congress, has the right lawfully to order and compel the county of Ashtabula, through its commissioners, to rebuild such bridge or to do the dredging described in such order and increase the present width of the channel of such stream, and within a prescribed time?

Where a structure is legally condemned as a public nuisance by reason of its obstructing navigation or otherwise, it is possible the owner may, in a proper case, be legally ordered and compelled to remove it; but it is beyond me to imagine that such owner could legally be ordered and compelled to rebuild, and rebuild according to the plans and specifications of the body ordering its removal, and within a time specified in such order or be arrested for non-compliance, and heavily fined, and for each month of non-compliance, as prescribed in such act.   It would be rank despotism that neither the legislative, executive or judicial departments of this government could exercise.   Therefore, in this respect also, the act in question is unconstitutional.   Congress can not order it done, nor confer the authority upon the courts.   And how can the commissioners be lawfully ordered and compelled to do the dredging described in this order, and thus increase the present width of the channel of this stream, unless originally the stream was of that depth and width at that point, and was filled and narrowed by the county by placing the pier thereon, or otherwise?

Instead however, of that being the case, it is conceded, and is a fact, that such center pier, as it is named in such order, was placed on the bank of the river, and not in the river at all.

As there is no claim or pretense that the county or its officers extended the river bank at this point westward into the river, and afterwards built this pier thereon, how can Congress constitutionally confer upon the secretary the authority to compel the county, or its commissioners, to do such dredging?

Having no authority to order and compel such commissioners to do such rebuilding and dredging, the order is nugatory, unlawful and unauthorized, as it is to be, and must be, enforced as a whole, or not at all.

But if the Congress could confer the power on the secretary to make such order, evidently the object Congress had in view was to render navigation through or under such bridges "reasonably free, easy and unobstructed" by the removal of such parts of such bridge as unreasonably obstructs such navigation; and therefore Congress conferred no authority upon such secretary to order such removal unless such part ordered to be removed was such an obstruction, the removal of which would of itself produce such result.

The pier in this case is not such an obstruction, and its removal without the dredging directed in the order would avail navigation nothing. The order therefore was nugatory—the secretary had no authority to make it. It must be viewed as a whole and can not be divided. If such was the intention of Congress, he can not require the removal and destruction of a part of a valuable and important structure like this bridge unless such part is an unreasonable obstruction to the navigation of the river, the removal of which would of itself facilitate such navigation.

But further, the order of the secretary is not a lawful order, and can not be enforced, and the commissioners held criminally liable for disobeying it, because he was mistaken as to each of the causes assigned by him as constituting the bridge an obstruction to navigation, and neither is true. As a fact, the so-called center pier, upon which the bridge swings, is not and never was in the river, but placed on the natural east bank of the river, south of the harbor proper, east of the harbor line; the draw span being the full width of the river—120 feet—and the faulty position of the navigable opening is caused, not by the

bridge, but solely by the short, sharp curve in the river itself. All of which is admitted to be and is true.

The secretary did not find otherwise as facts, but simply that he had good reason to believe them to be true.

Why, then, should such an order be obeyed? Why should the commissioners, under such an order, based upon a mistaken assumption of facts, undertake to and claim that they not only have the right to remove such bridge and build a new one at an expense to the tax-payers of this county, of at least $200,000, but that they are compelled to do so?

It is alleged in the petition that the object to be accomplished by the order of the Secretary of War is not to remove obstructions that are caused by this bridge or any of its parts, but to straighten the channel of the stream, and especially for the benefit of the railroad companies who own the docks at that point south of this bridge.

The statute of the state confers authority upon the commissioners, when they are required to act in such case (which they can not do save under a lawful condemnation), to levy a tax and issue bonds and pay the expense of acquiring property for the purpose of widening the channel, not to straighten it—which is the object to be accomplished in this instance. That this is the object of the War Department itself is apparent from the terms of the order. The order directs the commissioners not only to remove the center pier, which is at the point of the projecting elbow of the river bank, but to dredge at that point twenty-one feet below the mean lake level—cut the elbow off and straighten the channel.

The original order has been submitted to us by counsel for the defendants, as heretofore stated, and while we may not. regard it in the decision of the case, I simply refer to it as showing that the statements of the petition are correct, and that I am looking at the case in a proper and legitimate light. It differs, however, very little in its wording, and none in legal effect from the order as stated in the petition.

This order was made upon a second application, the Secretary of War having refused to interfere upon the first application. The grounds of his refusal are not stated, but must have been

that the center pier or bridge was no obstruction to navigation, or that the stream was not a water-way of the United States, or that he had no lawful authority to make such an order.

Here is the order that finally was made:

"To the County Commissioners of Ashtabula County, Ohio: Take notice, that whereas, the Secretary of War has good reasons to believe that the draw bridge of the county of Ashtabula, Ohio, across the Ashtabula river at Bridge street, in the harbor of Ashtabula, Ashtabula, Ohio, is an unreasonable obstruction to the free navigation of the said river and harbor, which are navigable water-ways of the United States, on account of an insufficient width of span, a faulty position of the navigable opening, and the existence of the center pier and its fender in the river, there being difficulty in passing the draw opening or draw span of such bridge by rafts, steamboats, or other water-craft. And whereas, the following alterations, which have been recommended by the Chief of Engineers, are required to render navigation through it reasonably free, easy, and unobstructed, to-wit: 'So alter said bridge as to afford a clear navigable opening not less than 140 feet between the fenders, and remove the present center pier and its fender and dredge at that point to a depth of twenty-one feet below mean lake level.' "

In this, the original and only order, the draw bridge is characterized as an obstruction which creates "difficulty in passing the draw or draw span of such bridge," for three reasons:

First. "On account of an insufficient width of span"—while the fact is that the span is the full width of the river.

Second. "A faulty position of the navigable opening"— faulty only because it is just where this short curve is in the river, and,

Third. "The existence of the center pier and its fender in the river"—and yet such pier is not in the river at all, nor is the bridge in the harbor proper, but south of it.

The order therefore itself, viewed in the light of the admitted facts, shows that the object was, not simply to have existing obstructions to navigation caused by this bridge removed, but to straighten the course and channel of the river, which can not be done save by the removal of such center pier.

That all parties so understood it is made more manifest by the admitted facts stated in the petition herein, that an en-

gineer of the War Department at Cleveland, Ohio, and the defendant commissioners, have agreed upon a plan for the rebuilding of the bridge, by which the west abutment is to be removed eastward fifty feet and placed in the present channel, and the street extended out to it, and the center pier removed eastward and the intermediate space on that side of the river dredged to the depth stated in the order, thus changing the course and channel of the stream fifty feet or more to the east, instead of removing the so-called center pier and its fender, and dredging at that point to the depth stated.

Further, this shows that the defendant commissioners are therefore intending to do, at a great expense to the tax-payers, that which they are not expressly required to do by the order of the Secretary of War, and for which they have no authority from the state.

Nor can they be compelled to obey the order itself.   It is absolutely void, as no part of the bridge obstructs navigation. Whatever obstruction exists results from the natural crooked course of the river itself.

This center pier is on the extreme point of the river bank elbow at this short curve.   If the river had been straight, who would have said that a bridge whose draw span cleared the whole river was an obstruction to navigation?

The defendant commissioners assert that the order of the Secretary of War in effect condemns and orders the whole bridge removed—that they are compelled to remove it and build a new one, and are acting lawfully in the matter.

The order of the Secretary of War not only does not condemn and order the removal of the bridge, but he could not lawfully make such an order.

This bridge is a legitimate part of an important street of the city of Ashtabula, and could not be ordered removed by the Secretary of War, and the continuity of the street destroyed. The act in question does not attempt to confer upon the secretary such power.   It confers upon him authority only to direct alterations to be made, and that is all that he undertook to do by the order in question—to increase the width of the span to 140 feet, twenty feet of an increase; which could easily be done

if it had to be done, by removing the so-called center pier, as the order substantially directs, twenty feet to the east, where the bridge could be swung upon it, as there is sufficient length to the bridge east of the pier to so arrange it with proper appliances.

Of their own motion the defendants intend, if not restrained, to remove the present bridge entirely and build a jack knife or elevator bridge in place of it in the manner and style I have indicated, and there is no legislative authority, congressional or otherwise, which authorizes them to do it, and to levy a tax upon the tax-payers of the county to pay the large expense of doing it.

The courts of this state have jurisdiction over this bridge, the commissioners, and the county and its funds; and the tax-payers, who would bear the whole brunt of the matter, are entitled to protection and the remedy here sought, and which is the only remedy by which such proceedings may be stayed. There is no remedy open to these parties against the United States or its Secretary of War, and if there was, it would be merely cumulative and not exclusive.

The case must be remanded to the common pleas court, with instructions to overrule the demurrer, and to grant a temporary injunction restraining the defendants from any action as prayed for, until the matter is finally decided.

Cook, J.

I concur in the judgment announced but do not concur in all the reasons assigned in support of the judgment. I do not think that the acts of September 19, 1890, and of March 3, 1899, which conferred upon the Secretary of War jurisdiction in cases of this character contravene the provisions of the Federal Constitution. The act of the secretary is merely an administrative act in carrying into effect the act of Congress, and if Congress could by special act constitutionally endow the Secretary of War with power to remove a particular obstruction from a navigable river, why could not it empower him by a gen-

eral act to remove all obstructions as they arise. It is true it gives the power to the secretary to determine what obstructions to the free navigation of the river are unreasonable.

The same principle applies to all the administrative departments. There must be the exercise of judgment. If the departments were deprived entirely of the exercise of judgment they would be ineffective to carry into execution the acts of Congress. To say that every time an obstruction is placed in a navigable river, or that a bridge, by reason of the enlarged use of the river, has become such an obstruction that it materially interferes with the free navigation of the river, or possibly entirely obstructs it, could not be removed except by a special act of Congress or a proceeding in court for that purpose, does not seem to me to be tenable.

The only question that the secretary can decide is: Is the bridge an unreasonable obstruction to the free navigation of the river? If he believes it is from the knowledge and information he has, then his ordering its removal is merely an administrative act. Whether it is there by legal right or not is a judicial question that must be determined upon a hearing in the courts as provided for in the acts of Congress, and neither Congress nor the secretary could finally determine that question. If found to be there under a legal right then the government must make a compensation before it can be removed, and this right to appeal to the courts, as we have said, is fully provided for by the acts of Congress. *United States* v. *City of Moline,* 82 Federal Reports, 592.

But the question in this case is under the admitted facts: Was there any obstruction in the Ashtabula river to be removed? If, as a matter of fact, there was no obstruction in the river, and that is admitted as far as this action is concerned, then there was nothing for the secretary to base his order upon. His authority was to order the removal of an obstruction and yet the allegations of the petition, as stated by my learned brother, in his very able opinion, clearly shows there was no obstruction and that by a combination between the representatives of the government and the county commissioners, under a pretended order of the Secretary of War, they, the commissioners, propose, except

they are restrained by the tax-payers of the county, to pull down a pier and dredge out the space so occupied by the pier to a depth of twenty-one feet at a point that was never in the river and therefore could not obstruct the river or navigation upon the river.

As shown by the petition, this bridge was built in 1889 by the county authorities, under the direction of the state. Land was purchased by the county on which to place this pier. This land nor the pier was ever within the boundaries of the river or within the harbor line. There is no complaint about the draw or the bridge proper. It is of sufficient height and breadth, but what the order requires is that the pier, which is concededly upon the county's own land not within the boundaries of the river, and in no manner obstructs navigation further than a building upon the bank of the river, and entirely without its boundaries would obstruct navigation, is ordered removed and the space dredged out to the depth of twenty-one feet in order to widen the river or straighten it.

The petition further avers that the commissioners have promised and agreed under this so-called order of the Secretary of War, to remove this pier east fifty feet, dredge out the space and further remove the west abutment opposite the pier, which stands on the bank of the river at the edge of the water, fifty feet east into the river, fill in the intervening space between the bank of the river and the new west abutment, and build an entirely new bridge of a different character, all at the expense of the county of $200,000, and all without tendering any compensation to the county.

This is all conceded by the demurrer. For what purpose is it done? It is said to straighten the river; that there is an elbow in the river and that the vessels now are so large that they can not get up the river without this is done. Has the Secretary of War any authority to require the county of Ashtabula to straighten the river at its own expense, or has the county commissioners any authority to agree with the government to carry out such a requirement? We think not, and that the tax-payers have a right to insist that the commissioners must stand upon their legal rights against such an arbitrary and illegal order, and

if, by fraud or from fear they refuse, that they may by the order of this court be required so to do. It is immaterial what is the language of the order. These are the averments of the petition which are admitted by the demurrer to be true.

Under these circumstances the Secretary of War, under the act of Congress under which he claims to be acting, has no authority to make such an order, and agree with the county commissioners to carry it into effect in the manner proposed. It would be a fraud upon the county. The commissioners still threaten to proceed in the manner stated, and they should be enjoined from so doing. Had the commissioners stood upon their rights, they could have contested all these questions in the federal courts. If informations were made or indictments found against them and the facts were as admitted by them in this suit, they could not possibly have been convicted; neither would the government be permitted by the federal courts to remove the pier and the bridge for the purpose of straightening the river until it paid the county full compensation for all damages that would result from the proposed improvement (*United States* v. *City of Moline, supra*). It is claimed that the act of March 24, 1904, of our General Assembly, confers upon the commissioners authority to act as they propose to do. This act could only authorize the commissioners to act in a legal manner, if it could do that; as it was enacted, no doubt for this special case, its constitutionality might well be doubted. However that might be, it does not authorize the commissioners to make an illegal and fraudulent agreement and combination with the officers of the government to spend' two hundred thousand dollars of the people's money.

*M. G. Spaulding* and *E. H. Starkey*, for plaintiff in error.

*White, Perry & Roberts* and *C. L. Taylor*, for defendants in error.