FILED
United States Court of Appeals
Tenth Circuit

**July 20, 2009**

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JANE DOE, a female juvenile,

      Defendant-Appellant.

No. 08-1137

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JOHN DOE, a male juvenile,

      Defendant-Appellant.

No. 08-1184

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:07-CR-483-EWN)**

---

David E. Johnson, Writing and Research Attorney, Office of Federal Public
Defender, (Raymond P. Moore, Federal Public Defender, Denver, Colorado;
Edward A. Pluss, Assistant Federal Public Defender, Denver, Colorado; William
L. Herringer, Greenberg & Herringer, LLC, Durango, Colorado, with him on the
briefs), Denver, Colorado, for Appellants.

John Milton Hutchins, Assistant United States Attorney, (Troy A. Eid, United States Attorney; Todd Parker Norvell, Assistant United States Attorney, with him on the brief), Denver, Colorado, for Appellee.

Before **BRISCOE, BALDOCK,** and **HOLMES**, Circuit Judges.

**BRISCOE**, Circuit Judge.

After segmented bench trials, the district court found Native American juveniles "S.W." and "R.K." (together, "defendants") guilty of an act of juvenile delinquency under 18 U.S.C. § 5031–37. The delinquent act was arson under 18 U.S.C. § 1153 and defined by 18 U.S.C. § 81. The district court sentenced S.W. to eighteen months' confinement and three years' supervision. The district court sentenced R.K. to three years' probation and twelve months' home detention. Defendants jointly appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

Defendants' appeals center on the definition of "person" in 18 U.S.C. § 1153(a)'s phrase: "Any Indian who commits against the person or property of another Indian or other *person* any of the following offenses . . . ." (emphasis added). First, defendants argue that context and statutory construction dictate that "person" is restricted to only living individuals. Second, and alternatively, defendants contend that at its broadest, "person" can only include living individuals or corporations, public and private. Under this definition, defendants

2

argue that there was insufficient evidence to establish that the arson victim was a corporation. Third, defendants argue that the district court abused its discretion by permitting the prosecution to reopen its cases to present evidence related to the corporate status of the arson victim. Fourth, defendants argue that the charging information was insufficient because it failed to provide sufficient identification of the arson victim and its status.

I

In April 2007, defendants broke into the Ute Mountain Presbyterian Church. While inside, defendants vandalized the church and started a fire. In December 2007, the government charged defendants with acts of juvenile delinquency. The information stated defendants' tribal membership, identified defendants as juveniles, and charged that defendants "willfully and maliciously set fire to or burned a building, namely, the Ute Mountain Presbyterian Church, located within the exterior boundaries of the Ute Mountain Ute Indian Reservation." R. Vol. I Doc. 2 at 1. The government later filed a superseding information that added a charge of aiding and abetting, but did not change any other description. Defendants denied the allegations.

On February 5, 2008, the district court began R.K.'s trial. Although the government presented seven witnesses, no evidence was presented regarding the ownership of the church. After the prosecution rested, R.K. moved for a judgment of acquittal, arguing that the prosecution failed to identify the victim of

3

the arson, which was an element of the charged crime. Ultimately, the district court agreed with R.K. and found, "there is no proof of who owned this church, and . . . there . . . has been no offense committed because there is an element missing." R. Vol. IIA at 100–01. The prosecution requested an overnight chance "to review the situation and possibly move to reopen the case." R. Supp. Vol. I at 2.

The next morning, February 6, 2008, the prosecution moved to reopen its case. R.K. objected and characterized the motion as an attempt to get "two bites at the apple." Id. at 6. The district court granted the motion to reopen because of "the overriding interest in justice." Id. at 9. The district court also granted R.K.'s request for a continuance to allow for discovery regarding the ownership of the church.

Also on February 6, 2008, the district court began S.W.'s trial. The prosecution presented nine witnesses. Edward Rousset, the pastor of the Ute Mountain Presbyterian Church, testified that the church had few members. R. Vol. II at 65. When asked "who owns the building," Pastor Rousset responded, "The Presbyterian—it's owned by the Presbyterians. It's Presbyterian Western Colorado." Id. at 66. Later during direct examination, Pastor Rousset confirmed that "the building of the church is actually owned by the Presbyterian church[.]" Id. at 68. Pastor Rousset also confirmed that the insurance policy on the building was "paid to the church[.]" Id. at 71. On cross examination, however, Pastor

4

Rousset acknowledged that he did not know how the Presbyterian church obtained title to the building.  Id. at 69.  The prosecution then rested "with some hesitation and reservation."  Id. at 71.

After the close of the prosecution's case, S.W. moved for judgment of acquittal, asserting arguments similar to those R.K. had raised.  In light of Pastor Rousset's testimony, S.W. also moved for a continuance to pursue discovery regarding the church's ownership.  The prosecution took no position on the requested continuance.  The district court granted the continuance and ordered briefing on the elements of 18 U.S.C. § 1153.

In its briefing before the district court, the prosecution identified the Ute Mountain Presbyterian Church as the victim of the arson.  The prosecution argued that the Ute Mountain Presbyterian Church, which it considered to be an association or society, falls within the definition of "person" under 18 U.S.C. § 1153 as defined by 1 U.S.C. § 1—"the word[] 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."  S.W. countered by arguing that the context of 18 U.S.C. § 1153 restricted "person" to only individuals, or individuals and corporations.

On March 13, 2008, the district court held a status conference on both cases.  During this conference, the prosecution moved to reopen its case against S.W.  S.W. objected.  The district court granted the request to reopen "in the

5

interest of justice and the truth-finding function." R. Vol. VI at 9. Counsel for R.K. agreed that "if the Court wants to go forward on [S.W.'s] case, then make findings of fact and then make—then rule that's what the law is on the case, after that . . . we may very well be willing to accept [that] finding of fact and ruling of law, even if it's adverse to us . . . I don't see any reason why the evidence would be substantially different in [R.K.'s] case or the Court's rulings on the law would be different." Id. at 6.

Three days later, on March 17, 2008, the district court reconvened S.W.'s trial. The government presented four additional witnesses. The additional testimony addressed ownership of the church building and included the submission of leases covering periods before and after the arson, and the building's insurance policy. S.W. testified for the defense. After closing arguments, the district court found that "the Presbytery of Western Colorado is clearly a nonprofit corporation, according [to] all the documentation." R. Vol. IV at 71. Additionally, the district court found that the Ute Mountain Presbyterian Church "is . . . a body or a building that was built by the Presbyterian church, the United Presbytery of Western Colorado, and is financed and run by and owned by the Presbytery of Western Colorado." Id. at 72. To support these findings, the district court relied on: (1) the lease in effect at the time of the arson that was signed by the Presbytery of Western Colorado; (2) the insurance policy naming the Presbytery of Western Colorado as the "owner or holder of the insurable

6

interest in the Ute Mountain Presbyterian Church"; (3) the payment to the Presbytery of Western Colorado of the insurance proceeds resulting from the arson; and (4) "that the entire course of conduct by everyone involved here treats this piece of property, namely the church building . . . , as the property of the Presbytery of Western Colorado." Id. at 73. Based on these findings,[1] the district court found there was "adequate proof that [S.W.] committed arson against the property of a person, namely the Presbytery of Western Colorado, a body corporate." Id. at 75.

On April 7, 2008, the district court reconvened R.K.'s trial. The parties stipulated that evidence from the second segment of S.W.'s trial would be treated as evidence in R.K.'s trial. The district court made similar factual findings as were made in S.W.'s trial.

After disposition hearings were held for S.W. and R.K. and judgments were filed, defendants filed timely appeals. We granted defendants' joint motion to consolidate the appeals.

## II

There are four issues on appeal: (1) the proper definition of "person" in 18 U.S.C. § 1153's language "[a]ny Indian who commits against the person or property of another Indian or other person any of the following offenses . . ."; (2)

---

[1] The findings also included a discussion of the other elements of 18 U.S.C. § 81 and 18 U.S.C. § 1153 that are not at issue here.

7

whether the prosecution provided sufficient evidence to prove beyond a reasonable doubt that the owner of the Ute Mountain Presbyterian Church was a "person" under this definition; (3) whether the district court abused its discretion in allowing the prosecution to reopen its case and present evidence concerning the ownership of the Ute Mountain Presbyterian Church; and (4) whether the information, which did not set out who owned the Ute Mountain Presbyterian Church, sufficiently charged defendants with a violation of 18 U.S.C. § 1153.

*1.      The definition of "person"*

*a.      Statutory language analysis*

To determine what entities are "persons" under § 1153, we first examine the statutory language. See Lippoldt v. Cole, 468 F.3d 1204, 1212 (10th Cir. 2006) (conducting a similar inquiry of the word "person" under the language of 42 U.S.C. § 1983). Section 1153(a) provides in pertinent part:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely . . . arson . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

Three variations of "person" appear in this language. While we acknowledge the presumption that "identical words used in different parts of the same act are intended to have the same meaning," that presumption "yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with

8

different intent."  Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 595 (2004) (internal quotation and citation omitted).

The varying usage of "person" in 18 U.S.C. § 1153(a) indicates different definitions.  Read in context, the first use of "person"—"commits against the person or property of another"—references the physical body of a living individual.  E.g. Webster's New International Dictionary of the English Language 1686 (3d ed. 1993) (listing "the body of a human being" as one definition of "person").  This is the only logical reading of "person" in this context.  The second use of "person"—"of another Indian or other person"—refers to an entity that either has a physical body or that can own property, and it is this reference to "person" that is the focus of our inquiry.  The third use of "person"—"all other persons committing any of the above offenses"—suggests a living individual capable of committing the listed offenses.  Because the changing uses of "person" require different definitions, the plain meaning of "person" in this statutory context is unclear.  See United States v. Jimenez, 507 F.3d 13, 19 (1st Cir. 2007) (listing several definitions of "person" and noting "[t]he word 'person' in isolation admits of more than one meaning").

Nevertheless, defendants argue that the second use of "person" in the statute refers only to living individuals.  To support this argument, defendants cite United States v. Bly, 510 F.3d 453, 463 (4th Cir. 2007), and the principle of statutory construction that, if possible, no word in a statute should be construed to

9

be superfluous.  E.g. Ansari v. Qwest Comm'ns Corp., 414 F.3d 1214, 1218 (10th Cir. 2005) (citing TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001)).  Without further explanation, defendants assert "[a]llowing the phrase 'Indian or other person' to include non-individuals would render the word ['Indian'] insignificant . . . ."  Aplt. Br. at 32 (quotation omitted).  We note the full context of the cited phrase states: "Any Indian who commits against the person or property of another Indian or other person any of the following offenses . . . ."  18 U.S.C. § 1153(a).  The statute can be clearly read to include crimes against the property of another person without negating the significance of the reference to crimes against the person or property of another "Indian."

Defendants cite the Fourth Circuit's statement in Bly in support of their contention that "person" as used in 18 U.S.C. § 1153(a) refers only to living persons:

> Bly's proposition that the term "person," as used in the Extortion Element, should exclude all sovereign entities and their subparts, has little appeal in the criminal law context. . . .  In support of this proposition, Bly relies on two Ninth Circuit decisions arising under 18 U.S.C. § 1153 (Indian major crimes statute). . . .  The Ninth Circuit ruled in those cases that a government entity could not be a victim under § 1153, because such an entity was not a living person. Even if correctly decided, those decisions seem readily distinguishable from our Extortion Element issue, in that § 1153 appears, by its terms, to relate exclusively to living persons.

510 F.3d at 463 (citations omitted).  We are hesitant to follow this dicta, which begins with the caveat "[e]ven if correctly decided."  Id.  We conclude that

10

defendants' reliance on Bly is irrelevant to our present inquiry.[2]  Similarly, it is unclear how defendants reach the conclusion that an expanded definition of "person" beyond living individuals renders the word "Indian" superfluous.

The Supreme Court in Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 201–06 (1993), provided guidance, in the form of four examples, for determining when the statutory context clearly restricts the definition of "person" to a living individual.  First, whether the statute indicates that the "person" is capable of self-representation in court.  Id. at 201.  Second, whether the statute uses adjectives or conditions, such as "poverty," that are nonsensical when applied outside of the living individual context.  Id. at 203.  Third, whether the statute requires the entity to take an oath.  Id. at 204.  Fourth, whether the statute applies criteria, such as tests for "necessities of life," that would be irrelevant to artificial entities.  Id. at 206.  From these examples, we infer that for "person" to mean only living individuals, the statute must suggest legal action that only a living individual may undertake or apply adjectives or

---

[2] While not directly addressing the definition of "person" under 18 U.S.C. § 1153, other cases arising under the statute have involved victims that were not living individuals.  E.g. United States v. M.W., 890 F.2d 239, 239 (10th Cir. 1989) (applying § 1153 to a juvenile committing arson involving the "Mill Creek School"); Johnson v. United States, 370 F.2d 495, 496 (9th Cir. 1966) (burglary of the "White River Trading Post"); United States v. Cardish, 145 F. 242, 243 (D.C. Wis. 1906) (arson of "certain dwelling house[s] of the United States . . . known as the 'Girls' [and Boys'] Building[s] of the Menominee Indian Training School'" and defining the crime as "arson against the property of another, to wit, of the United States of America").

11

tests that distinctly relate to the human condition. The present use of "person" requires only that the entity have a physical body or possess property. Because "persons" other than living individuals can possess property, we conclude that the statutory context does not require a "person" to be a living individual.[3]

b.    *Legislative history*

To the extent the plain meaning of the statutory language and context of "person" is unclear, we turn to the "'legislative environment' in which the word [person] appears," searching for an "indicia of congressional intent at the time the statute was enacted." Lippoldt, 468 F.3d at 1212 (internal citation and quotation omitted). The legislative history of § 1153 began with the Major Crimes Act of 1885. Keeble v. United States, 412 U.S. 205, 205 n.1 (1973). The relevant phrase—"against the person or property of another Indian or other person"—appeared in the original statute. Id. at 206 n.2. While later amendments added offenses and federal definitions for some of the offenses, arson was one of the original offenses identified. Id.; United States v. Welch, 822

---

[3] Defendants argue that additional canons of statutory construction, such as construing ambiguous statutes in favor of Native American sovereignty and the rule of lenity, "require that the phrase 'Indian or other person' be limited to individuals." Aplt. Br. at 36. Beyond suggesting a "narrow interpretation," Defendants, however, have not shown how these rules of statutory construction require the phrase "Indian or other person" to exclude non-living entities. Id. In this context, we are more persuaded by the Supreme Court's statutory analysis in Rowland to determine whether "Indian or other person" refers only to living individuals.

12

F.2d 460, 463 (4th Cir. 1987) (discussing amendment by the Indian Crimes Act of 1976).  For contemporaneous guidance, we look to the Dictionary Act of 1871. Lippoldt, 468 F.3d at 1214–15 ("[I]n attempting to discern the meaning of 'person' . . . we look not to how the words are defined now, but rather at how they were defined at the time the statute was enacted.").

The Dictionary Act of 1871 "was designed to supply rules of construction for all legislation."  Inyo County, Cal. v. Paiute-Shoshone Indians, 538 U.S. 701, 713 n.1 (2003) (Stevens, J., concurring).  Regarding the use of "person," the act states: "'person' may extend and be applied to bodies politic and corporate."  Id. (citing Act of Feb. 25, 1871, § 2, 16 Stat. 431).  Unincorporated associations were not persons under the Dictionary Act of 1871.

Conversely, we have stated that the current version of the Dictionary Act applies only prospectively.  Lippoldt, 468 F.3d at 1215.  Because the use of "person" in § 1153 predates the 1948 enactment of the current Dictionary Act, the definition of "person" in 1 U.S.C. § 1[4] is unpersuasive.  Id. at 1214 ("We do not read the current enactment of the Dictionary Act in 1 U.S.C. § 1 to require a contrary result.").  This statutory history implies that our approach does not contradict the Supreme Court's statement in United States v. A & P Trucking Co.,

---

[4] 1 U.S.C. § 1 provides in pertinent part: "the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals . . . ."

13

358 U.S. 121, 123 n.2 (1958):

> It is significant that the definition of 'whoever' in 1 U.S.C. § 1 was first enacted into law as part of the very same statute which enacted into positive law the revised Criminal Code [Title 18]. 62 Stat. 683, 859 (1948). The connection between 1 U.S.C. § 1 and the Criminal Code, which includes § 835, is thus more than a token one . . . .

Moreover, the inclusion of § 1153(b)[5] demonstrates an example of congressional intent to alter the definitions of terms in the Major Crimes Act of 1885. In contrast, the phrase at issue—"Any Indian who commits against the person or property of another Indian or other person any of the following offenses . . ."—has remained unchanged, and without further clarification, from its original enactment. Following Lippoldt and applying the Dictionary Act of 1871, we conclude that § 1153's use of "person" applies to living individuals and corporations, but does not apply to unincorporated associations. 468 F.3d at 1213–15.

c.    *Response to the dissent*

Although the dissent concurs with our conclusion—that § 1153's use of "person" applies to living individuals and corporations, but not unincorporated

---

[5] Section 1153(b) provides:

Any offense referred to in subsection (a) of this section that is not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

14

associations—the dissent "would reach that result based solely on the plain meaning of the statute's words in the context in which they are used." Dissent Op. at 1. The dissent's analysis, however, does not negate our reasoning on this issue.

As is the usual approach, the dissent also starts with the statutory language of 18 U.S.C. § 1153(a). The dissent reads this language to be unambiguous and considers our "foray" into legislative history to be inappropriate. Dissent Op. at 10. In its analysis, however, the dissent presumes the same legislative history that we cite. The dissent likewise applies the Dictionary Act of 1871 and notes that "we look to the version of the Dictionary Act in existence when the statute was enacted." Dissent Op. at 8 n.3. To select the Dictionary Act of 1871 as the defining statute, the dissent must determine when the statute was enacted and whether the language was subsequently altered. Consequently, the dissent's analysis requires the same information we applied—that Congress first enacted the relevant language in § 1153 in 1885 and that the language has remained unchanged.

Beyond the dissent's implicit statutory history analysis,[6] the dissent's characterization of the statutory language as unambiguous is potentially

---

[6] Instead of conducting statutory analysis, the dissent explicitly conducted "case history" analysis. Dissent Op. at 9 (citing cases from 1826 and 1844 for the proposition that "in 1885, it was well established that corporations were treated as persons").

15

problematic. The dissent reasons that because the "Dictionary Act of 1871 . . . makes it clear that 'person' includes corporations" "our interpretive task is simplified . . . ." Dissent Op. at 8. As a result, the dissent directly substitutes the definition of person from the Dictionary Act of 1871 for § 1153's usage of "person." Under this approach, however, significant questions arise about the other references to "persons" in § 1153—"Any Indian who commits against the **person** or property of another Indian or other **person** any of the following offenses, namely . . . arson . . . within the Indian country, shall be subject to the same law and penalties as all other **persons** committing any of the above offenses . . . ." (emphasis added). If the use of "other person" implicated the definition of the Dictionary Act of 1871, then the use of "all other persons" requires the same broad definition. This construction is nonsensical because corporations cannot commit the listed offenses.

The dissent attempts to remedy this confusion by stating, without citation, "The Dictionary Act acknowledges that, in some cases, the 'context' may indicate that a different meaning was intended." Dissent Op. at 10. This acknowledgment is identical to our logic that the statute is unclear because "the varying usage of 'person' . . . indicates changing definitions."

Consequently, to arrive at the dissent's conclusion—"viewed in its appropriately defined statutory context, which includes the Dictionary Act of 1871, and with reference to the common understanding of the term at the time of

16

the MCA's enactment, the specific usage of the term 'person' at issue here simply is not, in my view, unclear"—requires knowledge of when § 1153 was enacted and reasoning to distinguish this "specific usage" from other references to "persons." Dissent Op. at 11. This is the same path of statutory history and contextual ambiguity that we follow.

2.    *Sufficiency of the evidence to show corporate ownership of the church*

Having determined that the definition of "person" under § 1153 is restricted to living individuals or corporations, we turn to defendants' argument that there was insufficient evidence to prove beyond a reasonable doubt that the owner of the Ute Mountain Presbyterian Church was a corporation. Defendants argue that the Ute Mountain Presbyterian Church, which is not a living individual or a corporation, was the owner of the church building. In support of this contention, defendants highlight: (1) testimony from witnesses indicating that the Ute Mountain Presbyterian Church was the lessee of the building's land; (2) the lease in effect at the time of the arson identifying the Ute Mountain Presbyterian Church as the lessee; and (3) a lease agreement for the land renewed days after the arson identifying the Ute Mountain Presbyterian Church as the lessee. Defendants challenge the district court's conclusion that the Presbytery of Western Colorado was the owner based on the court's reliance on the signature by an agent of the Presbytery of Western Colorado on the lease in effect at the time of the arson, and the Presbytery of Western Colorado holding an insurance policy

17

on the church building.

While we concede that there is conflicting evidence regarding the ownership of the church building, more is required under the applicable standard of review for us to reverse these convictions. "We review sufficiency of the evidence challenges de novo to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Flanders, 491 F.3d 1197, 1207 (10th Cir. 2007) (citing United States v. Yehling, 456 F.3d 1236, 1240 (10th Cir. 2006)). We do not weigh conflicting evidence or evaluate witness credibility. United States v. Dazey, 403 F.3d 1147, 1159 (10th Cir. 2005). Instead, we view the evidence in the light most favorable to the prosecution. Id.

Having reviewed the transcript of the testimony and the submitted evidence, we conclude there is sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that the owner of the burned building was the Presbytery of Western Colorado. While the record contains vague and conflicting statements and contradictory assertions by the prosecution,[7] there is also evidence

---

[7] For example: "The church belongs to the church" and agreements that "the lease itself is in the name of the Ute Mountain Presbyterian Church." R. Vol. IV at 16, 18; "It is additionally clear that the 'person' (the church as an association or society) and the 'property' (the church's building) of that 'person' were injured and/or damaged as a result of the actions of the defendants." R. Vol. I Doc. 118 at 9; and "the church owned the building through the . . . First United Methodist Church." R. Vol. IIA at 93.

18

that the Presbytery of Western Colorado owned the church building. During the first day of S.W.'s trial, Pastor Rousset answered the question "who owns the building?" with the statement, "The Presbyterian—it's owned by the Presbyterians. It's Presbyterian Western Colorado." R. Vol. II at 66. After the trial was reopened, Kim Nofel, a minister for the Presbyterian Church U.S.A., testified that the "Presbytery of Western Colorado maintained insurance on the Ute Mountain Presbyterian Church building."[8] R. Vol. IV at 33. An agent for the Presbytery of Western Colorado signed the lease that was in effect at the time of the arson. Pastor Nofel and Gwen Cook, the clerk of the Presbytery of Western Colorado, testified that the Presbytery of Western Colorado was a nonprofit corporation. Id. at 37, 44. Viewing this evidence in the light most favorable to the prosecution, the evidence presented was sufficient to prove beyond a reasonable doubt that the Presbytery of Western Colorado, a nonprofit corporation, owned the burned building.

---

[8] Defendants argue that evidence related to how the building was insured does not indicate that the Presbytery of Western Colorado owned the building because "[t]he insurer of a piece of property is not necessarily the legal title holder to the property." Aplt. Br. at 50. Even if we accept this unsupported statement as true, the evidence regarding insurance was not irrelevant to the question of the building's ownership. See Fed. R. Evid. 401 (defining "relevant evidence" to be "evidence having any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence"). Under our standard of review for sufficiency of the evidence, we agree with the district court's statement, "Insurance documents can in some respects be important indicia of who owns a piece of property that is burned or destroyed . . . ." R. Vol. IV at 72.

19

*3.     The prosecution's motions to reopen the cases*

A "trial court is vested with wide discretion to permit the reopening of either party's case." United States v. Hinderman, 625 F.2d 994, 996 (10th Cir. 1980) (citing United States v. Keine, 424 F.2d 39, 40–41 (10th Cir. 1970)).  A court abuses its discretion "when it renders a judgment that is arbitrary, capricious, whimsical, or manifestly unreasonable." United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008) (quotation omitted).  In exercising its discretion on a motion to reopen, the district court should be mindful that:

> [T]he government's case-in-chief should not be treated as an
> experiment that can be cured after the defendant has, by motion,
> identified the failures.  But the trial court must be vested with
> discretion to permit reopening when mere inadvertence or some other
> compelling circumstance . . . justifies a reopening and no substantial
> prejudice will occur.

Hinderman, 625 F.2d at 996.  "Such discretion is not abused where there is no suggestion of surprise, and no further preparation is required to meet the testimony, particularly where a continuance is not requested." United States v. Alderete, 614 F.2d 726, 727 (10th Cir. 1980).  This court has also noted that a defendant should not be allowed to abuse a prosecutor's inadvertence "to gain an unjust result." United States v. Bolt, 776 F.2d 1463, 1472 (10th Cir. 1985) (quotation omitted).

The circumstances surrounding the motions to reopen differ between the trials of R.K. and S.W.  During R.K.'s trial, the prosecution rested, and then R.K.

20

moved for a judgment of acquittal. After the district court found, "There is no proof . . . . I think that there . . . has been no offense committed because there is an element missing," the prosecution requested an overnight continuance because it was "caught flatfooted." R. Vol. IIA at 100–01. The district court then asked if the prosecution wanted to reopen. The prosecution responded, "I would ask to reopen in the morning." Id. at 101. The following morning, the prosecution moved to reopen. The district court granted the motion "in the interests of justice" and referred to the element of proof relating to a "person" under § 1153 as a "technical element." R. Supp. Vol. I at 9–10.

During S.W.'s trial, the prosecution rested on February 6, 2008, and then S.W. moved for a judgment of acquittal. S.W. also requested a continuance for further discovery regarding the ownership of the church building, which the district court granted. On March 13, 2008, the prosecution moved to reopen. The district court granted the motion "in the interests of justice and the truth-finding function." R. Vol. VI at 10.

In both circumstances, we acknowledge that defendants suffered some degree of prejudice. Defendants were required to adapt to the prosecution's evolving assertions of which "person" owned the church building. We are not convinced, however, that these facts presented the requisite substantial prejudice to defendants. The district court granted S.W.'s request for a continuance and both trials were halted. There is no suggestion that defendants were surprised. In

21

fact, defendants raised the issue of the church's ownership and the statutory definition of "person," which supported the prosecution's motions to reopen. The prosecution and the defendants received additional time to research the legal and factual aspects of the church's ownership.

The prosecution's requests to reopen were due to inadvertence. As we noted before, no prior case clearly sets forth the definition of a "person" under 18 U.S.C. § 1153. In contrast, we have applied § 1153 to arson of a school without discussion of what person owned the school. M.W., 890 F.2d at 239–41. Given this isolated legal history, the prosecutor's failure to fully consider the definition of "person" and to gather the necessary evidence prior to trial to establish that element does not appear to be deliberate. We conclude the district court did not abuse its "wide discretion" by allowing the prosecution to reopen. Hinderman, 625 F.2d at 996.

4. *The sufficiency of the information*

a. *Standard of review*

We review de novo the sufficiency of an indictment.[9] United States v.

_____

[9] Arguably, the standard of review for the sufficiency of the information in this context is not strictly de novo. Defendants did not raise this issue until after the prosecution rested. While a timely-raised objection to the sufficiency of the information merits de novo review, courts are less "hospita[ble]" to challenges to an information later in the proceedings. United States v. Willis, 102 F.3d 1078, 1081 (10th Cir. 1996) ("Although we generally review the sufficiency of an indictment de novo, when a defendant fails to raise a timely challenge, we will

(continued...)

22

Redcorn, 528 F.3d 727, 733 (10th Cir. 2008). An indictment, or information, is sufficient "if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend, and if it enables a defendant to assert [a double jeopardy defense.]" United States v. Poole, 929 F.2d 1476, 1478 (10th Cir. 1991). "[I]t is generally sufficient that an indictment set forth an offense in the words of the statute itself, as long as those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." Redcorn, 528 F.3d at 733 (citations omitted). "Therefore, where the indictment quotes the language of a statute and includes the date, place, and nature of illegal activity, it need not go further and allege in detail the factual proof that will be relied upon to support the charges." Id. (citations omitted).

---

[9](...continued)
liberally construe an indictment in favor of validity.") (internal quotation omitted); United States v. Thompson, 356 F.2d 216, 226–27 (2d Cir. 1965) ("[T]he courts of the United States long ago withdrew their hospitality toward technical claims of invalidity of an indictment first raised after trial, absent a clear showing of substantial prejudice to the accused . . . ." and listing cases from the Fourth, Ninth, and Eighth Circuits); United States v. Lucas, 932 F.2d 1210, 1218 (8th Cir. 1991) (noting that "defendants did not make this challenge to the indictment until after the close of the government's case-in-chief" and "indictments which are tardily challenged are liberally construed in favor of validity"); United States v. De La Pava, 268 F.3d 157, 162 (2d Cir. 2001) ("The scrutiny given to an indictment depends, in part, on the timing of a defendant's objection to that indictment."). Because we also conclude that even if the information were insufficient, it resulted in only harmless error, we apply de novo review.

23

Here, the superseding information identified the date, place, and which church defendants allegedly burned. This is sufficient to enable defendants to assert a double jeopardy defense should they face subsequent charges. The question is whether, despite omitting any allegation of ownership of the building by a person, the superseding information contains the elements of § 1153. Although the superseding information does not quote the language of § 1153, it states that the conduct described was "in violation of Title 18 U.S.C. Section[] . . . 1153." R. Vol. I Doc. 61 at 2. As discussed, § 1153 requires the offense be committed "against the person or property of another Indian or other person . . . ."

Whether the identity of the victim must be contained in the indictment was touched upon in United States v. Moore, 198 F.3d 793, 795–96 (10th Cir. 1999). In Moore, we addressed a carjacking charge under 18 U.S.C. § 2119, which required the taking of a motor vehicle "from the person or presence of another." Id. at 796. The indictment identified the victim as the owner of the vehicle. The facts at trial indicated that the vehicle was taken in the presence of the owner's wife, and not the owner. The district court amended the indictment at the close of evidence to reflect the evidence at trial. We stated in Moore:

> As a general rule, an erroneous reference to the victim is not fatal to the indictment. See Dye v. Sacks, 279 F.2d 834 (6th Cir. 1960). In the case at hand, the Indictment named the victim as Brent Byers. Brent Byers was the victim's husband, and was the registered owner of the car. None of the evidence presented at trial suggested that Brent Byers was present during the bank robbery. Mr. Byers did not testify at trial. However, the victim Anne Byers did testify at trial

24

and was cross examined by the defendant. The defendant argued at trial as a defense that he was not guilty because he did not take the car from the "person or presence of another" and he used the testimony of Anne Byers in support of that argument. At no point during trial was the name of Brent Byers discussed. Where a variance is such that the defendant could not have anticipated from the allegations in the indictment what the evidence would be at trial, the defendant's Sixth Amendment right to notice of the charges against him is violated. See United States v. Stoner, 98 F.3d 527, 536 (10th Cir. 1996) cert. denied, 525 U.S. 961, 119 S. Ct. 403, 142 L.Ed.2d 327 (1998). However, where the defendant was not misled by the variance, his right to adequate notice and substantial rights are not prejudiced in any way. Id. at 536–37. Based upon the record before this court it does not appear that the defendant was prejudiced in any way by the variance to the Indictment. Mr. Moore was aware of the charges against him and presented his defense with the knowledge that Anne Byers was the alleged victim of the crime.

Id. at 796. Just as the defendant in Moore knew which car he was accused of carjacking, the defendants in the present cases knew which church they were accused of burning. Further, the defendants had the opportunity to present a defense to counter the prosecution's assertions regarding the church's ownership. See id. ("Mr. Moore . . . presented his defense with the knowledge that Anne Byers was the alleged victim of the crime.").

b.   *Harmless error*

Even if we accept defendants' contention that the identity of the church's owner should have been set forth in the information—although Moore provides that "[a]s a general rule, an erroneous reference to the victim is not fatal to the indictment," id.—we apply a harmless error standard of review when addressing challenges to the sufficiency of an indictment. United States v. Prentiss, 256 F.3d

25

971, 981 (10th Cir. 2001) (en banc) ("[W]e hold that the failure of an indictment to allege an essential element of a crime . . . is subject to harmless error review."), overruled in part on other grounds by United States v. Cotton, 535 U.S. 625 (2002). For the error to be harmless, the "omitted elements must be uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." United States v. Prentiss, 273 F.3d 1277, 1279 (10th Cir. 2001) (alterations omitted). Here, the omitted element was that the crime was committed "against the person or property of another Indian or other person." 18 U.S.C. § 1153(a). We have no doubt that the judgment would have been the same absent the error.

As discussed, the district court explicitly considered the identity of the church's owner. The district court found beyond a reasonable doubt that the Presbytery of Western Colorado owned the church. It would be illogical to assume this outcome would have been different if the indictment identified the Presbytery of Western Colorado as the church's owner. Accordingly, any possible error resulting from the indictment's omission of the identity of the church's owner was harmless.

While defendants challenged the question of the church's ownership by arguing that the prosecution's evidence was inconclusive, they presented no evidence contesting the church's ownership. Defendants had a month's continuance between raising the issue of the church's ownership and presenting

26

their defense. The only prejudice defendants allege is that the omission of the church's ownership from the information "enabled the government to switch its theory of the arson victim." Aplt. Br. at 63. This claimed prejudice does not indicate that the verdict would not have been the same absent the error. Instead, this claim is similar to the situation in <u>Moore</u>, where we found no prejudice to the defendant. 198 F.3d at 796.

*c.* *Response to the dissent*

To clarify our application of harmless error review, we briefly respond to issues raised by the dissent. While the dissent agrees that harmless error is the appropriate standard of review for an error in the information, it declines to conduct harmless error review because the government did not address the issue in its briefing or at oral argument. The dissent, however, notes that even if the government fails to raise an argument, the court can sua sponte review for harmless error after considering: (1) the length and complexity of the record; (2) whether the harmlessness of the error is certain or debatable; and (3) whether a reversal would result in protracted, costly, and futile proceedings in the district court. Dissent Op. at 23–24 (also noting that the most important consideration is whether the certainty of the harmlessness is readily apparent). Because the dissent considers the evidence ambiguous, making the certainty of the harmlessness not readily apparent, the dissent does not consider sua sponte harmless error review appropriate.

27

The dissent's reasoning on this issue is flawed for several reasons. First, applying the listed factors for conducting harmless error review supports its present application. The record in this case is not lengthy or complex. The trials for both defendants lasted less than one week. The certainty of the harmlessness is clear. Reversal would result in futile proceedings. The district court already granted a continuance for further briefing and argument on this issue. The district court explicitly considered evidence on this issue. Moreover, because defendants are juveniles, any future proceedings would have only questionable impact.

Second, although the dissent criticizes the government for not satisfying its burden to show harmless error, defendants have not alleged any error attributable to the insufficiency of the information. The extent of defendants' argument on this issue is that "this deficiency prejudiced the defendants because it enabled the government to switch its theory of the arson victim." Aplt. Br. at 63. The proper method to challenge and prevent the prosecution from changing its theory of the case is through a bill of particulars. Sullivan v. United States, 411 F.2d 556, 558 (10th Cir. 1969) ("If the accused desired more definite information for the proper preparation of a defense and to avoid prejudicial surprise, the remedy was by motion for a bill of particulars . . . ."). A bill of particulars entitles defendants to notice of the government's theory of the case. United States v. Tyler, 42 F. App'x 186, 190 (10th Cir. 2002) ("If the indictment sets forth the elements of the offense charged and sufficiently apprised the defendant of the charges to enable

28

him to prepare for trial, a bill of particulars is not necessary.  Significantly, a defendant is not entitled to notice of all of the evidence the government intends to produce, but only the theory of the government's case.") (internal citation and quotation omitted).  If defendants do not file a bill of particulars, they waive the right.  Phillips v. United States, 406 F.2d 599, 602 (10th Cir. 1969) (noting that defendant "defended his case in the trial court based on the elements of the crime for which he was charged.  Therefore[,] we conclude that the indictment adequately advised him of the crime of which he was accused.  Also[, defendant] was free to move for a bill of particulars if he was unsure of the charge against him.  By failing to do so[,] he has waived the privilege.").

Here, defendants did not file a bill of particulars and waited for the prosecution to close its case-in-chief before challenging the information.  Had defendants acted earlier, the error they now allege would have been avoided.  Although the government did not provide a sufficient harmless error argument, defendants provided little at trial or on appeal to which the government could respond.

Third, the dissent omits relevant evidence in its effort to find the harmlessness uncertain.  Although we acknowledge that there is conflicting evidence and confusion about the church's ownership, all of this confusion came from the prosecution.  Defendants did not present any evidence challenging the church's ownership.

29

Reviewing the record, the dissent focuses on Ms. Nofel's testimony and the leases for the church's land. Regarding Ms. Nofel's testimony, the dissent notes that nothing in her testimony "compels the court's conclusions." Dissent Op. at 25. Regarding the leases for the church's land, the dissent highlights the ambiguity resulting from the church being the lessee on the lease, but a Presybtery of Western Colorado representative also signing the lease. The dissent also considers the "Book of Order," for which neither the dissent nor defendants provide a citation in the record.

Absent from this analysis is a discussion of the testimony of Pastor Rousset. Before defendants raised any challenge to the church's ownership, Pastor Rousset answered the question of "who owns the building?" with the statement, "The Presbyterian—it's owned by the Presbyterians. It's Presbyterian Western Colorado." R. Vol. II at 66. This statement is not ambiguous. In combination with the lease and insurance document, this statement makes clear that the verdicts against the defendants would have been the same absent the error in the information.

III

We affirm the convictions in both cases.

30

08-1137, *United States v. Jane Doe*

08-1184, *United States v. John Doe*

**HOLMES**, Circuit Judge, concurring in part and dissenting in part.

I write separately because I disagree with two aspects of the majority opinion. First, I believe that the language of the Major Crimes Act ("MCA"), 18 U.S.C. § 1153, is clear and unambiguous. Therefore, while I concur with the conclusion of the majority—that the word "person" in the MCA includes corporations but excludes unincorporated associations—I would reach that result based solely on the plain meaning of the statute's words in the context in which they are used.

Second, I would hold that the status of the victim as a "person" is an essential element of any offense under the MCA that must be alleged in the charging document and proven beyond a reasonable doubt. By failing to allege that the offense was committed against an "Indian or other person," the information filed against the defendants did not charge them with the commission of a federal crime. Therefore, the defendants were convicted without due process of law. While we normally review the sufficiency of a charging document for harmless error, in this case the government has failed to argue that the error was harmless. And although we may, in some limited circumstances, undertake a harmless error analysis sua sponte, it is not appropriate for us to do so here. Therefore, I would vacate the defendants' convictions based on the inadequacy of

the information.  As a result, I would not reach the defendants' other arguments.[1]

## I. BACKGROUND

Defendants S.W. and R.K. are juveniles and members of the Ute Mountain Indian Tribe.  They, along with a third individual, J.C.,[2] set fire to the Ute Mountain Presbyterian Church, located within the Ute Mountain Indian Reservation.  There is no real dispute that they committed the acts with which they were charged.  Both defendants admitted to federal investigators that they at least "participate[d]" in setting the fire.  Aplt. Br. at 5, 8.  Neither defendant has challenged their confessions or raised any issue on appeal that even remotely resembles a claim of innocence.  Instead, the defendants simply maintain that they cannot be prosecuted under the MCA.

The defendants were charged by information with committing an act of juvenile delinquency, in violation of 18 U.S.C. §§ 5031-5037, 81, and 1153.  R., No. 08-1184, Vol. I, Doc. 61, at 1-2 (Superseding Information, filed Jan. 17, 2008).  The information alleged that the defendants—"all enrolled members of the Ute Mountain Ute Indian Tribe"—"did willfully and maliciously set fire to or

---

[1]    Specifically, it is not necessary to decide whether the district court abused its discretion in allowing the government to reopen its cases to present evidence as to the ownership of the church building.  Nor need we decide whether there is sufficient evidence to support the district court's conclusion that the building was owned by the Presbytery of Western Colorado.

[2]    J.C. eventually pleaded guilty and agreed to testify against S.W. and R.K.

burned a building, namely, the Ute Mountain Presbyterian Church." *Id.* The information thus named the defendants as members of the Ute Mountain Tribe, and it identified the building as being "located within the exterior boundaries of the Ute Mountain Indian Reservation." *Id.* But the information was silent as to who owned the church building.

R.K.'s bench trial began on February 5, 2008. The government called seven witnesses, including J.C., Pastor Rousset of the Ute Mountain Presbyterian Church, and the Bureau of Indian Affairs agent to whom R.K. had confessed. The government rested its case the same day. R.K. did not call any witnesses. Instead, he moved for a judgment of acquittal. *See* Fed. R. Crim. P. 29. He argued that one element of any conviction under the MCA is that the underlying offense be committed against "the person or property of another Indian or other person." 18 U.S.C. § 1153(a). R.K. argued that the government had failed to prove, or even allege, that the church was owned by an "Indian or other person," which he interpreted as meaning a natural person.

The government responded that it was not required to prove who owned the building, as it was sufficient to have unambiguously identified the building that was burned. In the alternative, the government suggested that the testimony of Pastor Rousset established that the building in question was owned by "the church." R., No. 08-1184, Vol. II, Doc. 219, Tr. at 92-93 (Trial to Court, dated Feb. 5, 2008). The court ultimately agreed with R.K. It found that the pastor's

testimony did not bear upon who owned the church building. The court further concluded that the information was "pretty shoddy" and that there "has been no offense committed because there is an element missing." *Id.* at 98, 101.

The next day, the government moved to reopen its case. It argued that, according to 1 U.S.C. § 1, "person" is broadly defined to include "corporations," "associations," and "societies." R., Supp. Vol. I, Tr. at 4 (Hr'g re Gov't's Mot., dated Feb. 6, 2008) (quoting 1 U.S.C. § 1). It interpreted this broad definition as including any individual or group other than a government agency. *Id.* at 5. The government represented that the building in question was owned by the Ute Mountain Presbyterian Church. It also claimed that the land on which the building was located was owned by the Ute Mountain Tribe and had been leased to the church. According to the government, since the church was not a government agency, it was an "other person" under the MCA.

The government's argument reflected a subtle shift in its jurisdictional theory, which it subsequently would explicate in its briefing in S.W.'s case. Specifically, the government no longer stressed the view that it was not required to name a victim as long as it unambiguously identified the building that was burned. Rather, its arguments now suggested that the words "Ute Mountain Presbyterian Church" do not identify the *building*, but, rather, the local congregation that *owns* the building—that is, the words purportedly identified the victim of the offense. The government was prepared to offer further testimony by

Pastor Rousset to prove that the church owned the building. The court granted the government's motion to reopen. The court also granted R.K. a 45-day continuance to allow him to investigate the Ute Mountain Tribe's property records.

The trial of S.W. began later that same day. Pastor Rousset testified for the government that the church building was "owned by the Presbyterians. It's Presbyterian Western Colorado." R., No. 08-1137, Vol. II, Doc. 127, Tr. at 66 (Trial to Court, dated Feb. 6, 2008). No other evidence as to the ownership of the building was presented. At the close of the government's case in chief, S.W. moved for a judgment of acquittal arguing, as had R.K., that the government had failed to allege or prove that the victim of the arson was a "person."

The court ordered the parties to submit briefs addressing whether the government had jurisdiction to prosecute S.W. under the MCA. In its brief, the government expressly took the position that it had, in fact, named a victim in the information—the Ute Mountain Presbyterian Church, which was an "association or society" and, therefore, a person under 1 U.S.C. § 1. R., No. 08-1137, Vol. I, Doc. 118, at 9 (Gov't's Br. Regarding Jurisdiction, filed Feb. 15, 2008). At a status conference on March 13, 2008, the government said that it was "fine with respect to the facts we've already presented in [S.W.]'s case," that is, Pastor Rousset's testimony. R., No. 08-1137, Vol. VI, Tr. at 7 (Status Conference, dated Mar. 13, 2008). Nonetheless, it moved to reopen its case in order to call new

witnesses, not previously called.  The court granted the motion.

When S.W.'s trial resumed four days later, the government once again changed its theory as to who owned the church building.  It now argued that the building was owned by the Presbytery of Western Colorado, a nonprofit corporation, and that the congregation of the Ute Mountain Presbyterian Church was a part of the Presbytery, not a separate, unincorporated association in its own right.  R., No. 08-1137, Vol. IV, Tr. at 148 (Trial to Court, dated Mar. 17, 2008).  The government acknowledged that its previous claims were inaccurate:

> We briefed the issue as well as we could with the facts that we had that we were able to elicit at the early February trial.
>
> . . . And as far as the church being a society or association in the technical terms of that of all of that, at the time that's the information that I had.  I didn't know that the Presbytery of Western Colorado was a nonprofit corporation . . . and the national church was a 501(c). . . . That was not information that I was aware of.

*Id.* at 146-47.

In addition to the four new witnesses that the government called, it also introduced a lease for the land on which the church building was built.  The lease names the Ute Mountain Presbyterian Church as the lessee, but the lease was signed by an agent of the Presbytery of Western Colorado.  A lease modification entered into in 2007, after the fire, again names as lessee the Ute Mountain Presbyterian Church.  However, it was signed this time by an agent of the church.  An insurance policy for the church building, on the other hand, was taken out by

the Presbytery.

The district court concluded that the church building was owned by the Presbytery of Western Colorado which, as a nonprofit corporation, is a "person" within the meaning of the MCA. It also found that the Ute Mountain Presbyterian Church is not an unincorporated association. Instead, it is simply a part of the Presbytery. *Id.* at 159-60 (holding that the Ute Mountain Presbyterian Church is a "trade name" or a "common way of denominating the particular location of where members who wanted to could go to worship"). The court concluded that S.W. had committed an act of juvenile delinquency by setting fire to the church building.

R.K.'s trial recommenced on April 7, 2008. He stipulated that the evidence presented by the government with respect to the ownership of the building could be considered in his case, as well. The court made similar findings of fact as in S.W.'s case and concluded that R.K. had committed an act of juvenile delinquency. This appeal followed.

## II. ANALYSIS

### A. Statutory Interpretation

The MCA endows the federal government with exclusive jurisdiction to prosecute an enumerated list of serious offenses committed by Indians within Indian country. 18 U.S.C. § 1153(a). However, the MCA only applies to offenses committed "against the person or property of another Indian or other

person." *Id.* The parties disagree as to the meaning of "other person." The defendants argue that, since "Indian" only refers to natural persons, so too must "other person" be limited to individuals. The government contends that "other person" should be broadly interpreted so as to have virtually no limiting effect, except, possibly, to exclude government agencies. Both sides are mistaken. I, like the majority, conclude that "other person" includes individuals and corporations but does not include unincorporated associations. We review de novo this question of statutory interpretation. *United States v. Vigil*, 334 F.3d 1215, 1218 (10th Cir. 2003).

"[I]n all cases of statutory construction, our foremost duty is to 'ascertain the congressional intent and give effect to the legislative will.'" *Ribas v. Mukasey*, 545 F.3d 922, 929 (10th Cir. 2008) (quoting *Padilla-Caldera v. Gonzales*, 453 F.3d 1237, 1241 (10th Cir. 2005)). We begin with the text of the statute, considering "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 711 (2003) (looking to "the legislative environment in which the word appears" when considering whether an Indian tribe is a "person" under 42 U.S.C. § 1983 (internal quotation marks omitted)). If the statute is clear and unambiguously answers the question at issue, we need not, and should not, go any further.

In this case, our interpretive task is simplified by the fact that the word "person" was defined by Congress and has been the subject of much litigation. The Dictionary Act of 1871, ch. 71, § 2, 16 Stat. 431, makes it clear that "person" includes corporations.[3] As originally enacted, the Dictionary Act provides that "in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate, . . . unless the context shows that [the word was] intended to be used in a more limited sense." *Id.*; *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 69 (1989) ("[T]he phrase ['bodies politic and corporate'] . . . was used to mean corporations, both private and public (municipal).").

The Dictionary Act also is consistent with the "general understanding" of the meaning of "person" when the MCA was enacted in 1885. *See Lippoldt v. Cole*, 468 F.3d 1204, 1213 (10th Cir. 2006). Even in 1885, it was well established that corporations were treated as persons. *See, e.g.*, *United States v.*

---

[3]     The government suggests that we should rely, instead, on 1 U.S.C. § 1, the current version of the Dictionary Act, which defines "person" much more broadly. The current version includes not just corporations within the definition but also "companies, associations, firms, partnerships, and joint stock companies." 1 U.S.C. § 1. However, when interpreting a statute, we look to the version of the Dictionary Act in existence when the statute was enacted. *See Lippoldt v. Cole*, 468 F.3d 1204, 1214 (10th Cir. 2006) (noting that when interpreting 42 U.S.C. § 1983, "the current text of the Dictionary Act does not control, because, beginning with *Monell*, in each instance where the Supreme Court has addressed whether a particular entity is a 'person' for the purposes of suing or being sued under Section 1983, it has principally considered the Dictionary Act of 1871").

-9-

*Amedy*, 24 U.S. 392, 412 (1826) ("That corporations are, in law, for civil purposes, deemed persons, is unquestionable."); *Louisville, Cincinnati, & Charleston R.R. v. Letson*, 43 U.S. 497, 558 (1844) ("[A] corporation created by and doing business in a particular state, is to be deemed to all intents and purposes as a person, . . . capable of being treated as a citizen of that state, as much as a natural person."); *see also Lippoldt*, 468 F.3d at 1214 (collecting cases).

It is equally clear that, in 1885, unincorporated associations were not persons. *Lippoldt*, 468 F.3d at 1213 ("[T]here was no general understanding . . . that unincorporated associations should be treated as natural persons."). Associations were not distinct legal entities—they had no standing to sue or be sued. *United Mine Workers of Am. v. Coronado Coal Co.*, 259 U.S. 344, 385 (1922) ("Undoubtedly at common law an unincorporated association of persons was not recognized as having any other character than a partnership in whatever was done, and it could only sue or be sued in the names of its members . . . ."); Wesley A. Sturges, *Unincorporated Associations as Parties to Actions*, 33 Yale L.J. 383, 383 (1924) (noting that "[t]he cases are remarkably in accord that . . . an unincorporated association cannot sue or be sued in the common or association name," because "'[t]here is no such entity known to the law as an unincorporated association'" (quoting *Pickett v. Walsh*, 78 N.E. 753, 760 (Mass. 1906))).

There is no reason to believe that when Congress enacted the MCA it

-10-

intended "person" to have anything other than its commonly accepted meaning.
The Dictionary Act acknowledges that, in some cases, the "context" may indicate
that a different meaning was intended. However, "context" is to be construed
narrowly to mean "the text of the Act of Congress surrounding the word at issue,
or the texts of other related congressional Acts, and this is simply an instance of
the word's ordinary meaning." *Rowland v. Cal. Men's Colony, Unit II Men's
Advisory Council*, 506 U.S. 194, 199 (1993). Thus, the "context" of the MCA
justifies our consideration of the Dictionary Act. But it is not a license to stray
from the text. In particular, "context" does not include legislative history. *Id.* at
200 ("If Congress had meant to point further afield, as to legislative history, for
example, it would have been natural to use a more spacious phrase, like 'evidence
of congressional intent,' in place of 'context.'").

The majority principally predicated its foray into the MCA's legislative
history on its conclusion that the word "person" in its "statutory context" is
unclear. Majority Op. at 9, 12. However, the fact that "the text of the Act of
Congress surrounding the word," *Rowland*, 506 U.S. at 199, indicates that the
word "person" has "varying usage[s]," Majority Op. at 9, within the statute does
not mean that the specific usage of the term at issue—concerning the victim of a §
1153(a) offense—is less than clear in "Indian or other person." Indeed, the
majority's reliance on the First Circuit's decision in *United States v. Jimenez*, 507
F.3d 13 (1st Cir. 2007), *cert. denied*, 128 S. Ct. 1321 (2008), as support for its

-11-

argument is misplaced. *Jimenez* actually militates against the majority's position. There, the court considered whether the term "person" in the aggravated identity theft statute, 18 U.S.C. § 1028A(a)(1), excludes deceased individuals—that is, whether the statute only covers living individuals. 507 F.3d at 19-20. The court noted that the word "person" viewed "in isolation admits of more than one meaning," rendering the meaning of the term "not clear" at first blush. *Id.* at 19. The court expressly "decline[d] to consider legislative intent," concluding that the statute's structure dispelled the "initial," apparent "ambiguity." *Id.* at 20. Similarly, viewed in its appropriately defined statutory context, which includes the Dictionary Act of 1871, and with reference to the common understanding of the term at the time of the MCA's enactment, the specific usage of the term "person" at issue here simply is not, in my view, unclear. And, therefore, we have no occasion to resort to legislative history.

We faced a similar question of statutory interpretation in *Lippoldt*, where the question was whether an unincorporated association was a "person" under 42 U.S.C. § 1983. 468 F.3d at 1211. Relying on *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), we considered "(1) the legislative history of Section 1983, (2) the general understanding, as of 1871, regarding the legal personality of unincorporated associations, and (3) the Dictionary Act of 1871." *Lippoldt*, 468 F.3d at 1213. While recognizing the obvious parallels between *Lippoldt* and this case, I do not read *Lippoldt* as

requiring, or even permitting, us to consider the legislative history of the MCA.

The use of legislative history in *Monell* and *Lippoldt* is the result of the Supreme Court's § 1983 jurisprudence. In *Monroe v. Pape*, 365 U.S. 167 (1961), *overruled by Monell*, 436 U.S. at 663, the Supreme Court held that municipalities were not "persons" under § 1983. In reaching this conclusion, the court relied, in large part, on Congress's rejection of the so-called "Sherman Amendment." *Id.* at 188-92. It interpreted the Amendment as imposing liability on municipalities. The Court concluded that, by failing to adopt the amendment, Congress clearly expressed its intent that municipalities not be subject to § 1983 claims. *Id.* at 191.

However, in *Monell* the Court reversed course, holding that a civil rights claim could be brought against a local Board of Education. *Monell*, 436 U.S. at 701. Before the Court could conclude that Congress intended "person" to include the Board, it was compelled to explain why its contrary holding in *Monroe* should be overruled. *Id.* at 665, 695-99. Upon a closer reexamination, the Court recognized that the Sherman Amendment, even if enacted, would not have created the kind of municipal liability at issue in *Monroe*. *Monell*, 436 U.S. at 664 ("[T]he nature of the obligation created by that amendment was vastly different from that created by [§ 1983].").

Thus, the Court's reliance on legislative history in *Monell* was necessary to explain why its prior analysis of that same history was mistaken. Here, however,

in interpreting the MCA, we are not saddled with a similar burden of overruling a prior, erroneous decision. Therefore, there is no reason for us to consider the history of the MCA. *See United States v. Ortiz*, 427 F.3d 1278, 1282 (10th Cir. 2005) ("When the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent." (internal quotation marks omitted)).

The defendants argue that even if the word "person," standing alone, generally includes corporations, the phrase "Indian or other person" refers only to individuals. They claim that only an individual can be an "Indian." Therefore, since "person" is juxtaposed with "Indian," an "other person" must, like an Indian, mean an "other individual." They further claim that this reading of the statute is necessary to support the purpose of the MCA, which was to extend federal jurisdiction to certain especially serious Indian-on-Indian crimes. Aplt. Br. at 33; *see Keeble v. United States*, 412 U.S. 205, 210-12 (1973). The defendants' argument is unconvincing. They fail to explain how their proposed interpretation furthers the purpose of the statute. Regardless of how we interpret "other person," it is undisputed that the MCA creates federal jurisdiction over crimes committed by Indians against other Indians. We must decide what *else* the MCA covers. Even if the *principal* purpose of the MCA was to cover intra-Indian crimes, it does not follow ineluctably that this was the statute's *only* purpose. Because the principal purpose of the statute is unaffected by our interpretation of

-14-

"other person," we cannot conclude that the combination "Indian or other person" manifestly expresses a congressional intent to override the Dictionary Act's definition.

The defendants also argue that we should construe the MCA as applying only to crimes against individuals because the "rule of lenity" requires ambiguous criminal statutes to be interpreted in favor of the accused. However, as we have stated, the MCA is not ambiguous. "The rule of lenity presupposes the application of a punitive, ambiguous statute, and we apply it 'only if, after seizing everything from which aid can be derived, . . . we can make no more than a guess as to what Congress intended.'" *United States v. Serawop*, 505 F.3d 1112, 1121-22 (10th Cir. 2007) (quoting *Muscarello v. United States*, 524 U.S. 125, 138 (1998)); *see also United States v. Ruiz-Gea*, 340 F.3d 1181, 1188 (10th Cir. 2003) ("[T]he rule of lenity is applied only when all other techniques for statutory construction leave the court in equipoise."). Since we have no doubt that corporations are persons under the MCA, the rule of lenity does not apply.

Similarly, the defendants argue that we should adopt a narrow definition of "person" out of respect for Indian sovereignty. As the Supreme Court has explained,

> The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well established that treaties should be construed liberally in favor of the Indians with ambiguous provisions interpreted to their benefit. . . .

-15-

The Court has applied similar canons of construction in nontreaty matters.

*County of Oneida, N.Y. v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985) (citations omitted).  But, as with the rule of lenity, this canon of construction only applies to ambiguous statutes.  *See, e.g.*, *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-44 (1980) ("*Ambiguities* in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence." (emphasis added)).  In particular, we only consider the effect on Indian sovereignty if the statute remains ambiguous even after consulting the legislative history.  *United States v. Thompson*, 941 F.2d 1074, 1077 (10th Cir. 1991) ("[W]hen congressional intent with respect to an Indian statute is unclear, courts will presume that Congress intended to protect, rather than diminish, Indian rights.  Reference to the legislative history, however, often will resolve uncertainties about the intent of Congress.").  We have already concluded that the MCA is unambiguous and that it is therefore inappropriate for us to consider its legislative history.  Thus, the defendants' invocation of Indian sovereignty must, *a fortiori*, fail as well.

**B.      Sufficiency of the Information**

The failure of an indictment to allege an essential element of a crime is a

constitutional error that we normally review for harmless error.[4] *United States v.*

*Prentiss* ("*Prentiss II*"), 256 F.3d 971, 973 (10th Cir. 2001) (en banc), *overruled*

*on other grounds by United States v. Cotton*, 535 U.S. 625 (2002), *as recognized*

*in United States v. Sinks*, 473 F.3d 1315, 1317 (10th Cir. 2007). I would hold

that, in any prosecution under the MCA, the status of the victim as an "Indian or

other person" is an essential element that, as a matter of due process, must be

---

[4]  An indictment serves two constitutional purposes:

> First, it informs the defendant of the nature and cause of the accusation as required by the Sixth Amendment of the Constitution. Second, it fulfills the Fifth Amendment's indictment requirement, ensuring that a grand jury only return an indictment when it finds probable cause to support all the necessary elements of the crime.

*United States v. Prentiss* ("*Prentiss I*"), 206 F.3d 960, 964 (10th Cir. 2000) (internal quotation marks omitted), *vacated in part by Prentiss II*, 256 F.3d at 981. However, in this case, the defendants are juveniles, and a juvenile delinquency adjudication "is a civil rather than a criminal prosecution." *United States v. Duboise*, 604 F.2d 648, 650 (10th Cir. 1979). Therefore, the Fifth and Sixth Amendments are not directly applicable. In a delinquency proceeding, juveniles do not have a right to be indicted by a grand jury. *United States v. Indian Boy X*, 565 F.2d 585, 595 (9th Cir. 1977). Instead, the government may proceed by information, as they did here. *See* 18 U.S.C. § 5032.

However, delinquency proceedings must provide due process. *In re Gault*, 387 U.S. 1, 27-28 (1967). In particular, juveniles must be provided notice of the charges against them. *Id.* at 33 ("Due process of law requires notice of the sort . . . which would be deemed constitutionally adequate in a civil or criminal proceeding."). Therefore, the failure of an information to allege all the essential elements of an offense is still a constitutional error, albeit under the Due Process Clause, rather than the Fifth or Sixth Amendment. I would apply the same standard of review to an information that we would to an indictment.

-17-

pleaded in the information. The government did not do so in this case, and, consequently, the information is inadequate. The government has failed to argue that the inadequacy of the information was harmless error. While we may, in certain limited circumstances, conduct a sua sponte harmless error analysis, it would not be appropriate to do so here. Therefore, I would hold that R.K. and S.W. were convicted without due process of law.

### 1. The status of the victim as an "Indian or other person" is an essential element of any prosecution under the MCA.

The MCA provides that:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses . . . within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the [listed] offenses . . . .

18 U.S.C. § 1153(a). According to the plain language of the statute, the government must prove that (1) the defendant is an Indian, (2) who committed one of the enumerated offenses, (3) against the person or property of another Indian or other person, (4) within Indian country. As already discussed, the term "Indian or other person" includes individuals and corporations, but it does not include unincorporated associations. Thus, an Indian who burns a building within Indian country that is owned by an unincorporated association has not committed arson against the property of an Indian or other person. Such a burning would not

-18-

be a federal offense under the MCA.[5]

As the majority recognizes, an information is sufficient "if it contains the elements of the offense charged, putting the defendant on fair notice of the charge against which he must defend, and if it enables a defendant to assert an acquittal or conviction in order to prevent being placed in jeopardy twice for the same offense." *United States v. Poole*, 929 F.2d 1476, 1479 (10th Cir. 1991) (internal quotation marks omitted). However, "a purpose corollary to the first is that the [charging document] inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *United States v. Moore*, 198 F.3d 793, 795 (10th Cir. 1999) (internal quotation marks omitted). The government has not met its obligation. The information does not contain all of the elements of the offense charged; it fails to allege that the defendants committed an offense against the person or property of another Indian or other person. *See Jones v. United States*, 526 U.S. 227, 232 (1999) (noting that every "element[] must be charged in the indictment"). The information merely alleges that the defendants set fire to a "building, namely, the Ute Mountain Presbyterian Church." R., No. 08-1184, Vol. I, Doc. 61, at 1-2. Based solely on the information, it is not possible for a court to determine

---

[5] The defendants have suggested that they might have been prosecuted in federal court under the Indian General Crimes Act, 18 U.S.C. § 1152. *See* Aplt. Br. at 19. However, the defendants were not charged under the General Crimes Act, and the scope of that statute is not before us.

whether the allegation is sufficient to support a conviction. Whether or not the information alleges a federal crime depends on who owned the building. If the building was owned by an unincorporated association, then even if the government proved every fact that it alleged, the defendants *still* could not be convicted under the MCA.

The conclusion that the status of the victim is an element of § 1153 should follow from our analysis in *Prentiss II*. In *Prentiss II*, the defendant was convicted under the Indian General Crimes Act ("IGCA"), 18 U.S.C. § 1152, of committing arson in Indian country. He appealed his conviction on the grounds that the indictment failed to allege that he was a non-Indian and that the building he set fire to belonged to an Indian. *Prentiss II*, 256 F.3d at 973. The IGCA does not confer federal jurisdiction over crimes committed by Indians against other Indians. Such crimes are generally left to the tribe to prosecute. *See Keeble*, 412 U.S. at 209-10 (discussing the history of the IGCA and the MCA). Absent proof that the offense was "interracial," no federal crime has been committed. Therefore, we concluded that the Indian/non-Indian statuses of the victim and the defendant are "constituent parts of the crime that must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." *Prentiss II*, 256 F.3d at 975 (alteration, citation, and internal quotation marks omitted). Not only is this conclusion consistent with the text of the statute and the long history of Supreme Court cases dealing with federal

-20-

jurisdiction over Indian country, it "also comports with the usual practice in criminal prosecution." *Id.* at 977 ("The terms of § 1152 do not suggest that Congress took the unusual step of requiring the defendant in a criminal case to identify the victims of the crime.").

Since *Prentiss II* dealt with the requirements of the IGCA, not the MCA, it is not binding precedent. However, the same considerations should govern our interpretation of both statutes. In *Prentiss II*, we held that the Indian/non-Indian status of the victim and the defendant was an essential element of any conviction under the IGCA. In this case, where the information did allege the defendants' Indian status, we must decide whether the status of the victim as an "Indian or other person" is an essential element of any conviction under the MCA (that is, whether, in the words of *Prentiss II*, it is a "constituent part[]" of the crime that must be charged). *Id.* at 975. I see no basis for treating these two questions differently. In fact, the arguments in this case are, if anything, even stronger than they were in *Prentiss II*.

In *Prentiss II*, the issue was whether, based on the structure of the IGCA, the exclusion of jurisdiction in the case of Indian-on-Indian crimes was an affirmative defense that had to be raised by the defendant. The Supreme Court previously had held that "an indictment or other pleading founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same

section or elsewhere." *McKelvey v. United States*, 260 U.S. 353, 357 (1922).

The government argued that the IGCA's jurisdictional limitations were contained in such a proviso. The first paragraph of the IGCA is a broad grant of jurisdiction to the federal government to prosecute crimes committed in Indian country. 18 U.S.C. § 1152 ("Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States . . . shall extend to the Indian country."). The second paragraph of the statute then limits that jurisdiction: "This section shall not extend to offenses committed by one Indian against the person or property of another Indian . . . ." *Id.* While recognizing the force of this argument, we ultimately concluded that despite the two-part structure of the IGCA, the statuses of the victim and the defendant were "so closely intertwined with the definition of the offense that the government must allege them in the indictment." *Prentiss II*, 256 F.3d at 979.

Here, the government has not, and could not, make a similar structural argument with regard to the MCA. Unlike the IGCA, the MCA lists all of the requirements necessary to establish jurisdiction in a single sentence. It does not contain any exceptions, exemptions, or provisos. Moreover, it is undisputed that at least *some* of those requirements, including that the offense be committed within Indian country, must be alleged in the charging document. *Cf. id.* at 987 (Baldock, J., dissenting) ("No one disputes that under § 1152 an element of the

-22-

crime of arson which the Government must allege is that it occurred in Indian country . . . .”).  I see no reason to treat the requirement that the offense be committed against an Indian or other person any differently.

The majority does not discuss the implications of *Prentiss II* for the sufficiency *vel non* of the information.  Instead, it relies on *Moore* for the proposition that “[a]s a general rule, an erroneous reference to the victim is not fatal to the indictment.”  *Moore*, 198 F.3d at 796.  In *Moore*, the defendant was charged with carjacking under 18 U.S.C. § 2119.  The statute required that the car be taken “from the person or presence of another,” and the indictment named Brent Byers, the owner of the car, as the victim.  *Id.*  However, it was proven at trial that Mr. Moore actually took the car from Anne Byers, Mr. Byers’s wife.  At the close of the evidence, the court altered the indictment to name Anne Byers as the victim.  *Id.* at 795.  We held that this change was merely a variance, not an amendment to the indictment.  Furthermore, the variance was not fatal, because “the defendant was not misled by the variance” and was able to “present[] his defense with the knowledge that Anne Byers was the alleged victim of the crime.”  *Id.* at 796.  We therefore affirmed the conviction.

*Moore* is inapposite and should not control the outcome of this case.  Regardless of *who* the victim was, Mr. Moore was still charged with committing a federal offense, that is, taking a motor vehicle from the person or presence of another.  The indictment alleged each and every element of the offense.  Even

-23-

though the indictment misidentified the victim, there was no question that Mr. Moore's alleged conduct would, if proven, violate the carjacking statute. The same cannot be said here. Absent any language indicating that the church building was owned by an individual or corporation, the information did not charge R.K. and S.W. with a crime.

The authority relied upon in *Moore* is similarly distinguishable and unpersuasive. In *Dye v. Sacks*, 279 F.2d 834 (6th Cir. 1960), the defendant filed a habeas corpus petition, claiming that the trial court had impermissibly amended the indictment by correcting the name of the victim. The Sixth Circuit denied the petition, because "[t]he amendment did not change the nature of the offense charged . . . . It related to a matter of form and not of substance." *Id.* at 837. Here, however, the failure to name *any* victim did "change the nature of the offense," and, more to the point, it affected whether there was any offense charged at all. Therefore, insofar as the majority's argument for the alleged legal sufficiency of the information is predicated on *Moore*, it is, in my view, misguided.

> **2.      In light of the government's failure to address the issue, we should not consider, sua sponte, whether the insufficiency of the information was harmless error.**

Having concluded that the information filed against the defendants was inadequate, we next turn to the question of whether the error was harmless. In general, "the government bear[s] the burden of proving harmlessness." *United*

*States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008). Here, the government unquestionably has failed to carry its burden. The government's brief does not address the sufficiency of the information. There is no discussion of the issue, whatsoever.[6] In particular, the government never argues, or even suggests, that any potential error in the information would be harmless. Therefore, we must first decide whether it is appropriate to conduct the harmless error analysis sua sponte. Given the evidence presented at trial, I believe that the harmlessness of the error is too uncertain. Based on our decision in *United States v. Holly*, 488 F.3d 1298 (10th Cir. 2007), we should not reach out to decide whether the error was harmless.

"[W]here the government has failed to assert harmless error, this court 'may in its discretion initiate harmless error review in an appropriate case.'" *Id.* at 1307-08 (quoting *United States v. Samaniego*, 187 F.3d 1222, 1224 (10th Cir. 1999)). However, we "should . . . be hesitant to engage in an 'unsolicited, unassisted, and undirected harmless error review.'" *Id.* at 1308 (quoting *Samaniego*, 187 F.3d at 1225). We have identified three factors that we consider in determining whether to exercise our discretion: "(1) the length and complexity

***

[6] When asked at oral argument whether its brief responded to the defendant's insufficiency of the information claim, the government stated that it believed the issue was addressed in the same footnote that addressed our decision in *Prentiss II*. The government appears to be referencing footnote 14. Aplee. Br. at 40 n.14. However, footnote 14 does not address the issue.

of the record; (2) whether the harmlessness of the errors is certain or debatable; and (3) whether a reversal would result in protracted, costly, and futile proceedings in the district court." *Samaniego*, 187 F.3d at 1225. The most important of these factors is the certainty of the result.[7] *See Holly*, 488 F.3d at 1308 ("Despite this court's general reluctance to *sua sponte* apply harmless error review, it may be appropriate to do so where the certainty of the harmlessness is readily apparent."). "Evaluation of the certainty of the harmlessness necessarily requires this court to review the record to some extent, though not to the same degree as would be required pursuant to a full harmless error review." *Id.*

The district court found that the jurisdictional requirements of the MCA were satisfied. It based its conclusion on two related factual findings: (1) that the Ute Mountain Presbyterian Church is a part of the Presbytery of Western Colorado and does not have a separate and independent existence in its own right, and (2) that the church building was owned by the Presbytery, which is a nonprofit corporation. I cannot conclude that these factual determinations were

---

[7]     We have repeatedly questioned the wisdom of relying on the third factor. *See Samaniego*, 187 F.3d at 1225 n.2; *Holly*, 488 F.3d at 1308 n.8. Moreover, I am sympathetic to Judge Tacha's concern that we not allow ourselves to be dissuaded from pursuing the correct result simply because the record is long and complicated. *Samaniego*, 187 F.3d at 1227 (Tacha, J., dissenting) ("In my judgment, an appellate court cannot be excused from its duty to study a record . . . just because a record is lengthy and/or complicated. The scope of the record does not excuse the appellate court from reviewing it and attempting to determine whether harmless error analysis is appropriate.").

"uncontested and supported by overwhelming evidence." *Neder v. United States*, 527 U.S. 1, 17 (1999). An error is harmless only if no reasonable fact-finder could have reached a contrary conclusion. *United States v. Prentiss* ("*Prentiss III*"), 273 F.3d 1277, 1279 (10th Cir. 2001). Even assuming that there was sufficient evidence supporting the district court's findings,[8] the district court's findings were not the only ones that reasonably could have been drawn from the evidence.

Kim Maria Ruth Nofel, a "minister of word and sacrament for the Presbyterian Church U.S.A.," R., No. 08-1137, Vol. IV, Tr. at 113, testified that the Ute Mountain Presbyterian Church is a "mission church," and, as such, "is under the guidance and encouragement and support of the Presbytery of Western Colorado." *Id.* at 114-15. She also testified that the church is governed by the Towaoc Ministry Board, which is a committee of the Presbytery. *Id.* at 114, 115-16. Her testimony is certainly consistent with the idea that the church is a part of the Presbytery. The district court appears to have given significant weight to the classification of the Ute Mountain Presbyterian Church as a mission church. The court recognized that some local churches contained within the geographic boundaries of the Presbytery may indeed be separate corporate entities, apart from

---

[8] In addition to their challenge to the sufficiency of the information, the defendants also argue that there was insufficient evidence to support the district court's factual findings. Because I would reverse based on the inadequate information, I would not reach this argument.

the Presbytery. *Id.* at 156-57. Nonetheless, it concluded that, as a mission church, the Ute Mountain Presbyterian Church was too reliant on the Presbytery to be considered an independent association.

Nothing in Ms. Nofel's testimony, however, compels the court's conclusions. Ms. Nofel testified that, although she was not certain, she suspected that the Ute Mountain Presbyterian Church—like her church, the Montezuma Valley Presbyterian Church—was incorporated. *Id.* at 123. Thus, it is possible for a mission church to receive guidance and support from the Presbytery and yet still remain a separate and distinct legal entity. Moreover, as the defendants point out, the Book of Order, which is the Constitution of the Presbyterian Church, specifically recognizes that churches may be organized as unincorporated associations and that such associations can hold legal title to property.[9] Aplt. Br. at 51 & Attach. 6. Thus, the testimony of Ms. Nofel does not definitively resolve the issue of whether the defendants committed an offense against a "person."

The other evidence relied on by the government and the district court is equally ambiguous. For example, the government introduced the lease for the land on which the church building was built. The lease names the Ute Mountain Presbyterian Church as the lessee, yet the lease was signed by a representative of

---

[9]     The same provisions specify, however, that all property held by or for a church, regardless of whether or not it is incorporated, is held in trust for the national Presbyterian Church (U.S.A.). Aplt. Br. Attach. 6.

the Presbytery of Western Colorado. Both parties make legitimate arguments that the lease supports their position. Similarly, the district court found persuasive the fact that the church building was covered by the Presbytery's insurance policy. After the church was burned, the proceeds of the policy were paid to the Presbytery. The court noted that "[i]nsurance documents can in some respects be important indicia of who owns a piece of property." R., No. 08-1137, Vol. IV, Tr. at 157. But even the insurance policy is not conclusive. According to Ms. Nofel, the Presbytery maintained an umbrella policy that covered all the church buildings within the Presbytery, including those of churches that own their own buildings, such as the Montezuma Valley Presbyterian Church, which she testified is a nonprofit corporation. *Id.* at 118, 123, 125. So even if the insurance policy provides "important indicia," it is still amenable to multiple interpretations.

The question of whether the government had jurisdiction to prosecute the defendants under the MCA was fiercely contested in the district court. It was, in fact, the *only* issue raised by the defendants. Furthermore, the evidence relied upon by the district court is less than overwhelming. Thus, without deciding whether the government's error was harmless, the question of harmlessness is not so certain or readily apparent as to justify our conducting a sua sponte review.

### III.  CONCLUSION

I agree with the majority that the word "person," as used in the MCA, includes both individuals and corporations but excludes unincorporated

-29-

associations.  However, for the foregoing reasons, I would hold that the information filed against the defendants was inadequate in that it failed to allege that the offense was committed against an "Indian or other person."  Moreover, the government failed to argue that the error was harmless.  And I would conclude that it is not appropriate, in this case, to perform a sua sponte harmlessness analysis.  I would, therefore, reverse the decision of the district court and vacate the convictions of the defendants.  I respectfully dissent.